[Civ. No. 2110.   Third Appellate District.—February 19, 1920.]

ETTA IRENE MAYBORNE, Respondent, v. CITIZENS TRUST & SAVINGS BANK (a Corporation), Administrator, etc., Appellant.

[1] Personal Services—Duty to Pay Reasonable Value of—Presumption.—When services are rendered by one person, from which another derives a benefit, although there is no express contract or agreement to pay for the services, there is a presumption of law which arises from the proof of services rendered that the person enjoying the benefit of the same is bound to pay what they are reasonably worth.

[2] Id.—Intention of Parties — Relationship — Inference.—The question as to whether such services were intended to be gratuitous or to be a charge against the party who was benefited thereby is one that must be determined on the circumstances of the particular case, the question in each case being whether it can reasonably be inferred that pecuniary compensation was in the view of the parties at the time the services were rendered or the support furnished; and in the consideration of such circumstances, the degree of the relationship of the parties may strengthen or diminish the implication that the services were acts of gratuitous kindness and affection according to its proximity or remoteness.

[3] Id.—Action on Rejected Claim—Admissibility of Void Will.—In an action on a rejected claim against an estate for the reasonable value of services rendered the decedent over a period of many years terminating with his death, an instrument executed by the decedent purporting to devise and bequeath to plaintiff certain real and personal property "for care and faithful services rendered," though insufficient as a will, is admissible as a recognition by the decedent of the value of the services of plaintiff and a declaration of his purpose and intention to reward her for the same.

[4] Id.—Intention of Parties—Justness of Claim—Consideration by Court.—In such action, it is entirely proper for the trial court, in the determination of the intention of the parties, to weigh the circumstance that it would be just and equitable for the plaintiff to be rewarded for her services.

[5] Id.—Employment for Indefinite Period—Time of Payment not Specified—Statute of Limitations.—Where a contract for services, either express or implied by law, is for an indefinite time and no time for payment is specified, the statute of limitations does not begin to run until the services end.

[6] ID.—INDEFINITE PERIOD OF EMPLOYMENT—STATUTE OF FRAUDS NOT APPLICABLE.—The provision of subdivision 1 of section 1624 of the Civil Code requiring "an agreement that by its terms is not to be performed within a year from the making thereof" to be evidenced by a writing, subscribed by the party to be charged, does not apply to contracts, either express or implied, for the rendition of services for an indefinite period of time and pay· ment to be made at the termination of the relationship.

[7] ID.—ACTION ON QUANTUM MERUIT—STATUTE OF FRAUDS.—Subdivision 7 of section 1624 of the Civil Code, requiring a writing for the validity of an agreement "which by its terms is not to be performed during the lifetime of the promisor, or an agreement to devise or bequeath any property or to make any provision for any person by will," is not applicable where the person who rendered services or furnished support seeks to recover .upon a *quantum meruit.*

[8] ID.—STATUTE OF FRAUDS—RETROACTIVE EFFECT.—A statute requiring a writing for the validity of a particular agreement does not control in a case originating before the enactment of such statute.

.APPEAL from a judgment of the Superior Court of Los Angeles County.  Robert M. Clark, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Alfred Wright for Appellant.

Goodwin & Morgrage and John A. Powell for Respondent.

BURNETT, J.—There is no substantial conflict between the parties as to the facts of the case, but in our statement we shall resolve whatever minor differences there may be, as far as justified by the record, in favor of respondent. The appeal is from a judgment in favor of plaintiff on a claim against the estate of C. P. Dutton, rejected by his administrator, for the reasonable value of personal services rendered the decedent over a period of more than twenty years, terminating in his death in 1915.  Mr. Dutton was formerly a prominent well-to-do resident of the city of Aurora, Illinois.  In 1873 he married a woman fifteen years his junior and three sons were born of the marriage.  In 1894, after some years of estrangement, he and his wife finally separated, and after the separation, at the invitation of Mr. Mayborne, an old friend and acquaintance, Mr. Dutton

took up his residence in the Mayborne home in Geneva, Illinois, a town some nine miles distant from Aurora. The family consisted of Mr. and Mrs. Mayborne, Miss Grace Mayborne, an elder sister, more or less of an invalid, and Miss. Etta Mayborne, the plaintiff. Due to the age of her parents and the sickness of her sister, plaintiff was the housekeeper, and had general charge of the affairs of the home. The situation was agreeable and satisfactory to Mr. Dutton, and he soon came to be treated as a member of the family. All his wants were supplied and he entertained his old friends at his new home as though it were his own residence. Changes took place in the family; Mr. Mayborne died, later Mrs. Mayborne, and an elderly uncle was given a home until he too passed away. Mr. Dutton, however, remained, asking and receiving increasing care and attention. Mr. Dutton and the two Mayborne sisters began going to California, spending several winter months in each year in Los Angeles. Finally, in 1905, Mr. Dutton erected a house, known as "Redwood Lodge," at Hollywood, near Los Angeles, which served as their California home, and finally became their permanent residence. He died in May, 1915. At many times and to many persons, after becoming a member of the Mayborne family, Mr. Dutton expressed the greatest satisfaction with and the highest appreciation of the care, attention, and services he received from plaintiff, and several times expressed his intention of remunerating plaintiff for her services to him. There is no doubt that the closest friendship existed between plaintiff and Mr. Dutton, and they were received by their mutual acquaintances upon a plane of social equality, but no improper relations existed between them, plaintiff acting in the capacity of housekeeper and nurse for him. After his death an instrument purporting to be a will was found among his papers by which he expressly recognized his obligations to plaintiff and attempted to devise to her all his estate in California. The instrument, however, was ineffective as a will. The claim of plaintiff having been rejected, an action was brought, and the court found: "That for twenty years continuously prior to and including May 26, 1915, plaintiff, at the special instance and request of C. P. Dutton, rendered constant service to said C. P. Dutton in maintaining a home for him; in caring for him and administering to his comfort therein;

in looking after and caring for his clothes and linen; and in supervising and performing all of the duties of conducting, managing, and carrying on a home for said C. P. Dutton; that all of said services were rendered during all of said time by plaintiff, with the understanding and agreement between plaintiff and said C. P. Dutton that he would compensate her for said services in money or property to the amount of the reasonable value of said services upon the termination of said services at or before his death. That said services were not terminated before the death of said C. P. Dutton.'' It is further found that said Dutton did not compensate plaintiff to any extent for said services, and that the reasonable value for them is eighteen thousand dollars.

The only serious contention by appellant is that the evidence is insufficient to support that portion of the findings to the effect that the services were performed with the understanding and agreement that plaintiff was to be compensated therefor. It is not disputed that plaintiff served the decedent as claimed by her. Indeed, there is no conflict in the evidence as to that, and the allegation of the complaint in that respect was not denied in the answer. The position of appellant is that there is no evidence of an express agreement for compensation and that there is no rational ground for the inference that it was the understanding and expectation of the parties that plaintiff should be paid for her services. It may be admitted that there is no direct evidence of any such express agreement, but it is the contention of respondent that from the evidence the trial court was warranted in concluding that the parties contemplated and understood that she was to be paid the reasonable value for her services and that such understanding was sufficient to impose a legal liability therefor.

[1]  Appellant does not dispute the general rule, as stated in *Moulin* v. *Columbet,* 22 Cal. 509, that "when services are rendered by one person, from which another derives a benefit, although there is no express contract or agreement to pay for the services, there is a 'presumption of law' which arises from the proof of services rendered, that the person enjoying the benefit of the same is bound to pay what they are reasonably worth."

[2]  It is, though, justly contended that this is a mere presumption and "liable to be rebutted by proof of a special

agreement to pay therefor a particular amount or in a particular manner, or by proof that the services were intended to be gratuitous, or even by particular circumstances, from which the law would raise the counter-presumption that the services were not intended to be a charge against the party who was benefited thereby.'' Appellant goes further in the claim that this case is an exception to the general rule in that plaintiff performed the services as a member of the household and, therefore, could not claim the advantage of said presumption or implication of law. Decisions are cited to the effect that under such circumstances the presumption is, rather, that the services are gratuitous and that the burden is upon the claimant to overcome this presumption. We need not review these various decisions as we find a sufficient guide for our purpose in the declarations of the supreme court in *Crane* v. *Derrick*, 157 Cal. 667, [109 Pac. 31], as follows: ''It has been said many times that the question is one that must be determined on the circumstances of the particular case, the question in each case being whether it can reasonably be inferred that pecuniary compensation was in the view of the parties at the time the services were rendered or the support was furnished. (Am. & Eng. Ency. of Law, 2d ed., p. 1061, sec. 21; *Murdock* v. *Murdock*, 7 Cal. 513; *Friermuth* v. *Friermuth*, 46 Cal. 42, 45.) In the consideration of such circumstances, the degree of the relationship may strengthen or diminish the implication that the services are acts of gratuitous kindness and affection according to its proximity or remoteness. (1 Beach on Law of Contracts, sec. 653.) Our own decisions support the doctrine that to authorize compensation in such cases the circumstances must be such as to warrant the inference that it was the expectation of both parties that compensation should be made. (*Murdock* v. *Murdock*, 7 Cal. 513; *Friermuth* v. *Friermuth*, 46 Cal. 42.) And it is emphatically declared in *Murdock* v. *Murdock* that it is the expectations of the parties existing while the relation continued that is to control, and no circumstance occurring afterward can convert that into an implied contract, that was not so before.'' Under this test the claimant is not required to prove any *express* contract, but it is sufficient if from the facts and circumstances it reasonably can be inferred that compensation was in the view and contemplation of the parties.

Even assuming that said presumption in the instance of a family applies to this case by reason of the fact that plaintiff was treated largely as a member of the household, yet we are satisfied that a careful reading of the testimony would convince any disinterested mind that it is not an irrational conclusion that said services were performed in the expectation of both parties that Miss Mayborne would be rewarded in a pecuniary manner. We are required, of course, to go no further than to say that such conclusion of the trial court is not unreasonable, although we may believe that a finding the other way would be amply supported. Moreover, under the peculiar circumstances herein, although in a limited sense the parties lived together as a family, the industry, fidelity, and self-denial of plaintiff in the services she performed would indicate quite an unusual and extraordinary person if she had no expectation of such reward and reason to believe that it would be realized. The more rational inference would seem to be the other way, if we take into view the ordinary tests and motives of human conduct. Mr. Dutton's wants were thoughtfully supplied; he was carefully nursed in illness, and, as he grew old and feeble, he received increasing care and attention. Since there is no claim of any meretricious or improper relations between the parties, why should anyone suppose that she would so deport herself without expectation of substantial compensation?

And as to Mr. Dutton, would it not be doing rather an injustice to his memory to assume or to infer that he, an elderly man of means and somewhat infirm, would willingly be the mendicant recipient of such solicitous and laborious attention from a young woman to whom he was not related by blood or consanguinity? The cases wherein such services are presumed to be gratuitous rest upon some natural or conventional obligation of mutual care and consideration, and the present instance hardly belongs to that class. Plaintiff was under no legal or moral duty to render services to Dutton. In contemplation of law they were strangers to each other, and as between such, the law says that beneficial services rendered and accepted must be paid for. (*McFarland* v. *Holcomb,* 123 Cal. 84, [55 Pac. 761]; *Estate of Rohrer,* 160 Cal. 574, [Ann. Cas. 1913A, 479, 117 Pac. 672].)

In the *Estate of Rohrer,* the plaintiff, who was the niece of decedent through marriage, presented a claim for services in nursing the deceased for a period of nineteen months prior to his death. The supreme court, through Mr. Justice Melvin, said: "There was no such relationship between Mr. Rohrer and Mrs. Follmer as would raise any presumption that the services were gratuitous. The facts that she was the wife of Mr. Rohrer's nephew and that she and her husband resided in Mr. Rohrer's home do not raise any presumption that she nursed the sick man without expectation of reward."

In this connection it is well to remember that when Miss Mayborne began to serve Mr. Dutton, and for some time thereafter, it is fair to assume that there was no such intimacy as developed in subsequent years. It is to this earlier period that we must look for evidence of an understanding as to remuneration, and upon the most liberal construction in favor of appellant, it cannot be held that in consequence of the character of their relations at that time the presumption would be that the services were gratuitous.

Many witnesses testified as to the daily life and conduct of these parties and as to the nature of the services performed by plaintiff; and, to indicate and illustrate its general scope and intent, we quote the testimony of Clara B. Wells, who resided in the Mayborne family as a roomer and boarder from 1898 to 1905, as follows: "Miss Mayborne did everything about the house. She would contribute to Mr. Dutton's board and to his care. She did everything about him—his personal affairs. I was with her much of the time. We were very companionable and I had a chance to be with her much. She did everything such as taking care of his linen, packing and unpacking, and much of the time Mr. Dutton was not well and she took care of him. He was never strong and when he was well and went to business she always called for him—went to the train with him in the morning and called for him in the evening. It was a long mile, I should say, from the Mayborne home to the train. She conducted the house and was at its head, and when we had no cook she did the cooking and dishwashing and harnessed the horse and looked after the hay for him. It was Miss Mayborne's house. I should say it was the house which her father and mother lived in before their death.

I think Miss Mayborne was born in the house. During
that time I had many conversations with Mr. Dutton. I
had conversations with him relative to the time that he had
gone to this home and he told me that he came there during
the lifetime of Miss Mayborne's father. I think he was
associated with her father in the law. They were friends
or they were together much and seemed to live at her home
during the lifetime of her father and mother. The father
and mother were not living when I went there and I never
met them. He continued from the time that I met him
there, and during the seven years that I was there, to remain
in that house. Mr. Dutton told me that he went to Miss
Mayborne's house almost a physical wreck. He had been
slightly injured in the Civil War and he came out of the
Civil War not very robust, and I think he was suffering
from either acute or nervous indigestion. I saw, during my
stay there, that he was troubled with vertigo and acute
attacks of indigestion. I don't know that he spoke of it
often, but he was free in his expression that he was quite
a wreck when he went to Miss Mayborne's home and it
was almost entirely due to her care and comfort that he
was kept alive. He confided in me that it was his regret
that he hadn't an incontestable provision for Miss Mayborne
in the way of annuity for life insurance of some nature, and
at the time he spoke of it I said, 'Why don't you, now?'
He said, 'Well, the trouble is I am too old. I have passed
my sixty-first birthday,' and that at the age of sixty-one
the insurance companies wouldn't take him, or that the
price was prohibitive. I don't recall, but what he said he
was past sixty-one and couldn't arrange for straight life
insurance which would be incontestable. He was driving
in the country and he was in a reflective mood, and finally
he said, 'I will make it all right, because I own several
farms,' and then he spoke of some stock he owned at that
time. At that time he was interested in National Biscuit.
This conversation was in Illinois, but having failed in making
the definite provision for her it would all be arranged,
because he had some interest in farms and he also owned
some stock in the National Biscuit and Westinghouse, I
think, and he spoke of some other interests which I don't
recall. He said he wanted an incontestable provision be-
cause he knew the money he left to Miss Mayborne, his

heirs would contest it, even if it was a shoestring. This was in autumn, probably nearer 1905 than 1900.''

Describing a later conversation held with Mr. Dutton, the witness said: ''I had another conversation with him with reference to the services or compensation that had been made or would be made. This was about the year following my first conversation. I should say now it would be about twelve or thirteen years ago and that it took place at Ottawa, Illinois. Q. What did Mr. Dutton say in that conversation, Mrs. Wells? . . . Mr. Dutton spoke about some farms he had lately acquired in Kane County and spoke about his holdings in farm lands in Kane County, and also spoke about some National Biscuit stock and some Diamond Match stock, which, together with the farming interests and the Diamond Match and National Biscuit stock, would go to Miss Mayborne as compensation for the care she had given to him. Q. Was anything said in that conversation by Mr. Dutton with reference to whether or not he had expressed his intention to Miss Mayborne? . . . Yes, he said that Etta would be well provided for and that it was necessary she know how she stood, because in all probability she would have to take care of Grace. I don't recall that he said in so many words that he had said this to Miss Etta Mayborne. No, he didn't speak of any definite conversation he had with Miss Mayborne, but he spoke about having made the arrangement.''

Still later Mr. Dutton again spoke of these matters: ''On one of our summer visits to Evergreen Lawn on Sunday afternoon, Mr. Dutton described the home they were planning—in fact, it was then building here in California. He said it was Etta's. That was in the summer of the year the house out there was built. It was the summer they were building the bungalita. They called it Redwood Lodge.''

The facts and circumstances detailed by this and other witnesses were as strongly indicative of an understanding that plaintiff should be rewarded as was the showing of an understanding that the earnings of the wife were to be her separate property in the case of *Kaltschmidt* v. *Weber*, 145 Cal. 596, [79 Pac. 272], to which we may refer for an interesting discussion of a kindred subject.

[3] This view is strengthened by a consideration of the abortive will of the deceased. Of course, he intended it to

be effective as a testamentary disposition of the property therein mentioned, but the body of it was typewritten and it was not witnessed. Therefore, it could not be probated, but it was signed by Dutton and was in the following form:

"Redwood Lodge, Hollywood, California,
"May 21st, 1915.

"In case of death, I give to Etta Irene Mayborne, all real estate and personal property, of which I may die seized, found in the state of California. Also all shares of stock in my name, in the American Chicle Company and in the Westinghouse Air Brake Company. This I give to Etta Irene Mayborne for care and faithful services rendered."

Said instrument while insufficient as a will, was clearly admissible as a recognition by Dutton of the value of the services of plaintiff and a declaration of his purpose and intention to reward her for the same. The significance of such evidence is indicated in the Rohrer decision, *supra*. Coming, as it does, many years after the services began, said instrument does not, of course, give rise to any *presumption* that the same purpose existed in the beginning, but it tends to strengthen the inference from other facts and circumstances of the existence of such purpose or, at least, to rebut any inference or presumption that the parties contemplated that the services should be gratuitous.

[4] We may add that it was entirely proper for the trial court in the determination of the intention of the parties to weigh the circumstance that it would be just and equitable for plaintiff to be rewarded for her services. The average person is supposed to be influenced by such considerations, and it would be natural to suppose that Mr. Dutton was not insensible to their controlling force and would entertain a corresponding purpose to reward Miss Mayborne.

In this connection we may call attention to the following additional authorities cited by respondent: *Gall* v. *Gall*, 27 App. Div. 173, [50 N. Y. Supp. 563]; *Clark* v. *Gruber*, 74 W. Va. 533, [82 S. E. 338]; *Morrissey* v. *Faucett*, 28 Wash. 52, [68 Pac. 352]; *Ellis* v. *Cary*, 74 Wis. 176, [17 Am. St. Rep. 125, 4 L. R. A. 55, 42 N. W. 252]; *Heffron* v. *Brown*, 155 Ill. 322, [40 N. E. 583]; *Briggs* v. *Estate of Briggs*, 46 Vt. 571; *Wainwright Trust Co.* v. *Kinder* (Ind. App.), 120 N. E. 419.

In the last of these the claimant was an adult child living with her father, and the court in affirming a judgment in her favor held that while there was a *prima facie* presumption that the services were not to be paid for, it was also held that the intention to pay and expectation of compensation, raising an implied contract, could be inferred from the circumstances and conduct of the parties, and that it was not necessary to show, either directly or through others, any communication by parent to child. In the discussion of the facts the court declares that attention may be given to the justice or injustice of the claim for the purpose of determining what was the intention of the parties in relation to the question of compensation for the services in controversy, citing 9 Cyc. 242, 243.

That is a recent decision, and in the character of the services performed quite similar to the case at bar, although the evidence herein in favor of the claimant is stronger than it was in that.

In the Briggs case *supra,* the supreme court of Vermont said: "In all cases in which it has been held that the law will not imply a promise to pay for valuable services rendered with the knowledge of the recipient, such a relation has existed between the parties *before the rendering of the services,* that the defendant was not bound to pay for the services. The relation is usually that of parent and child. When the child arrives at majority, but remains or returns to the parent, or when the parent goes to live with the child, the law presumes the parties have retained or returned to the relation that once existed between them, and will not presume that they thereby assumed the relation of debtor and creditor, unless it is shown that they actually understood that they came together with their relation changed from what it formerly had been to that of debtor and creditor."

In the Ellis case the supreme court of Wisconsin held that, by reason of the fact that the claimant was a stepdaughter, it was incumbent upon her to show that she was to be remunerated for her services. The court said: "To meet this obligation she proved the express parol agreement for compensation. True, such agreement is void as a contract for the reasons stated, and hence cannot be enforced specifically nor constitute the basis of an action for damages." The said agreement, it may be stated, was in part

for the devise of land and therefore void under the statu-
of that state. The court, however, held that said agreement
was admissible to rebut the presumption that Mrs. Ellis
rendered the services in question gratuitously.

The other cases are in harmony with these, nor do we
find the cases cited by appellant to be inconsistent with the
views herein expressed when the peculiar facts of each are
considered.

[5] We think there is no merit in the contention that
the claim is barred by the statute of limitations. The ser-
vices were continuous for a period of twenty years, and it is
a fair inference that it was the intention or expectation that
they should be rewarded when terminated. They did not
cease until the death of Mr. Dutton. The case falls clearly
within the rule announced in *Krumb* v. *Campbell*, 102 Cal.
370, [36 Pac. 664]; *Hagan* v. *McNary*, 170 Cal. 141,
[L. R. A. 1915E, 562, 148 Pac. 937]; *Furman* v. *Craine*,
18 Cal. App. 41, [121 Pac. 1007]; *Clark* v. *Gruber*, 74
W. Va. 533, [82 S. E. 338]; *Morrissey* v. *Faucett*, 28 Wash.
52, [68 Pac. 352]. They are all to the effect that where
the contract is for an indefinite time and no time for pay-
ment is specified, the statute does not begin to run until
the services end. Of course, the same rule applies to an
express contract and to one implied by law.

There is also force in the claim of respondent that said
will contains a "direct, distinct, unqualified and uncondi-
tional admission of the debt," sufficient to meet the require-
ments of the decisions in this state, and thus to take the case
without the statute of limitations, but we do not deem it
necessary to decide this point.

[6] We think there is no more merit in the contention
that the contract herein was invalid by reason of subdivision
1 of section 1624 of the Civil Code, which requires "an
agreement that by its terms is not to be performed within
a year from the making thereof to be evidenced by writing,
subscribed by the party to be charged." This rule does not
apply to contracts, either express or implied, for the ren-
dition of services for an indefinite period of time and pay-
ment to be made at the termination of the relationship.
(*Dougherty* v. *Rosenburg*, 62 Cal. 32; *Kutz* v. *Fleisher*, 67
Cal. 93, [7 Pac. 195]; *Osment* v. *McElrath*, 68 Cal. 466,
[58 Am. Rep. 17, 9 Pac. 731]; *Raynor* v. *Drew*, 72 Cal. 307,

[13 Pac. 866]; *Bank of Orland* v. *Finnell*, 133 Cal. 475, [65 Pac. 976]; *Stewart* v. *Smith*, 6 Cal. App. 152, [91 Pac. 667].) To fall within the condemnation of the statute the contract must be such as to be incapable of performance within one year. Manifestly, we have no such situation here.

Indeed, the proper view of this case, as we understand it, is that the services were performed without any express agreement as to compensation, but with the expectation and understanding that at some time in the future, probably on the death of Mr. Dutton, the plaintiff would be paid the reasonable value of her services.

[7] Nor do we think that subdivision 7 of said section, requiring a writing for the validity of an agreement "which by its terms is not to be performed during the lifetime of the promisor, or an agreement to devise or bequeath any property or to make any provision for any person by will," applies to a case like this for recovery upon a *quantum meruit.* (*Hagan* v. *McNary*, 170 Cal. 141, [L. R. A. 1915E, 562, 148 Pac. 937]; *Wallace* v. *Long,* 105 Ind. 522, [55 Am. Rep. 222, 5 N. E. 666].) [8] Besides, said section was first incorporated into the statutes in 1905 and it would not control in a case originating before said date. (*Keefe* v. *Keefe,* 19 Cal. App. 310, [125 Pac. 929].)

Certain objections were made to the admissibility of evidence and they are briefly referred to in the written argument of appellant, but we do not understand counsel to contend that the rulings are sufficiently grave to justify a reversal of the judgment. At any rate, we have examined them and find therein no prejudicial error.

As we must view the record, we cannot escape the conclusion that the claim of respondent was just and reasonable and established by legal evidence to the extent that an appellate tribunal is not warranted in interfering with the judgment of the lower court.

The judgment is affirmed.

Ellison, J, *pro tem.*, and Hart, J., concurred.