[No. G016463. Fourth Dist., Div. Three. Aug. 31, 1998.]

CLAIRE MAGLICA, Plaintiff and Respondent, v.
ANTHONY MAGLICA, Defendant and Appellant.

**COUNSEL**

Wasser, Rosenson & Carter, Dennis M. Wasser, Lyon & Lyon, Robert C. Weiss, Roy L. Anderson, Crosby, Heafey, Roach & May, Peter W. Davis and James C. Martin for Defendant and Appellant.

Keker & Van Nest, John W. Keker, Karin Kramer, Wendy J. Thrum and Helene M. Linker for Plaintiff and Respondent.

**OPINION**

**SILLS, P. J.—**

## I. INTRODUCTION

This case forces us to confront the legal doctrine known as "quantum meruit" in the context of a case about an unmarried couple who lived together and worked in a business solely owned by one of them. Quantum meruit is a Latin phrase, meaning "as much as he deserves,"[1] and is based on

---

[1] See Black's Law Dictionary (5th ed. 1979) page 1119, column 1.

the idea that someone should get paid for beneficial goods or services which he or she bestows on another.[2]

The trial judge instructed the jury that the reasonable value of the plaintiff's services was either the value of what it would have cost the defendant to obtain those services from someone else or the "value by which" he had "benefitted [sic] as a result" of those services. The instruction allowed the jury to reach a whopping number in favor of the plaintiff—$84 million—because of the tremendous growth in the *value* of the business over the years.

As we explain later, the finding that the couple had no contract in the first place is itself somewhat suspect because certain jury instructions did not accurately convey the law concerning implied-in-fact contracts. However, assuming that there was indeed no contract, the quantum meruit award cannot stand. The legal test for recovery in quantum meruit is not the value of the benefit, but value of the services (assuming, of course, that the services were beneficial to the recipient in the first place). In this case the failure to appreciate that fine distinction meant a big difference. People who work for businesses for a period of years and then walk away with $84 million do so because they have acquired some *equity* in the business, not because $84 million is the going rate for the services of even the most workaholic manager. In substance, the court was allowing the jury to value the plaintiff's services as if she had made a sweetheart stock option deal—yet such a deal was precisely what the jury found she did not make. So the $84 million judgment cannot stand.

On the other hand, plaintiff was hindered in her ability to prove the existence of an implied-in-fact contract by a series of jury instructions which may have misled the jury about certain of the factors which bear on such contracts. The instructions were insufficiently qualified. They told the jury flat out that such facts as a couple's living together or holding themselves out as husband and wife or sharing a common surname did not mean that they had any agreement to share assets. That is not *exactly* correct. Such factors can, indeed, when taken together with other facts and in context, show the existence of an implied-in-fact contract. At most the jury instructions should have said that such factors do not *by themselves necessarily*

---

[2]See, e.g., *Earhart* v. *William Low Co.* (1979) 25 Cal.3d 503, 518 [158 Cal.Rptr. 887, 600 P.2d 1344] ("Where one person renders services at the request of another and the latter obtains benefits from the services, the law ordinarily implies a promise to pay for the services."); *Palmer* v. *Gregg* (1967) 65 Cal.2d 657, 660 [56 Cal.Rptr. 97, 422 P.2d 985] ("The measure of recovery in *quantum meruit* is the reasonable value of the services rendered, provided they were of direct benefit to the defendant."); *Hedging Concepts, Inc.* v. *First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419 [49 Cal.Rptr.2d 191] ("A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice . . . .").

show an implied-in-fact contract. Accordingly, when the case is retried, the plaintiff will have another chance to prove that she indeed had a deal for a share of equity in the defendant's business.

## II. FACTS

The important facts in this case may be briefly stated. Anthony Maglica, a Croatian immigrant, founded his own machine shop business, Mag Instrument, in 1955. He got divorced in 1971 and kept the business. That year he met Claire Halasz, an interior designer. They got on famously, and lived together, holding themselves out as man and wife—hence Claire began using the name Claire Maglica—but never actually got married. And, while they worked side by side building the business, Anthony never agreed—or at least the jury found Anthony never agreed—to give Claire a share of the business. When the business was incorporated in 1974 all shares went into Anthony's name. Anthony was the president and Claire was the secretary. They were paid equal salaries from the business after incorporation. In 1978 the business began manufacturing flashlights, and, thanks in part to some great ideas and hard work on Claire's part (e.g., coming out with a purse-sized flashlight in colors), the business boomed. Mag Instrument, Inc., is now worth hundreds of millions of dollars.

In 1992 Claire discovered that Anthony was trying to transfer stock to his children but not her, and the couple split up in October. In June 1993 Claire sued Anthony for, among other things, breach of contract, breach of partnership agreement, fraud, breach of fiduciary duty and quantum meruit. The case came to trial in the spring of 1994. The jury awarded $84 million for the breach of fiduciary duty and quantum meruit causes of action, finding that $84 million was the reasonable value of Claire's services.

## III. DISCUSSION

### A. *The Jury's Finding That There Was No Agreement to Hold Property for One Another Meant There Was No Breach of Fiduciary Duty*

■ Preliminarily we must deal with the problem of fiduciary duty, as it was an alternative basis for the jury's award. We cannot, however, affirm the judgment on this basis because it is at odds with the jury's factual finding that Anthony never agreed to give Claire a share of his business. Having found factually that there was no contract, the jury could not legally conclude that Anthony breached a fiduciary duty.

The reason is that fiduciary duties are either imposed by law or are undertaken by agreement, and neither way of establishing the existence of a

fiduciary duty applies here. As to the former, the fact that Claire and Anthony remained unmarried during their relationship is dispositive. California specifically abolished the idea of a "common law marriage" in 1895 (see *Elden* v. *Sheldon* (1988) 46 Cal.3d 267, 275 [250 Cal.Rptr. 254, 758 P.2d 582]) and that, if it is not too harsh to say it, was clearly the *substance* of Claire and Anthony's relationship. They had a common law marriage.

As our Supreme Court said in *Elden*, "[f]ormally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage." (*Elden* v. *Sheldon*, *supra*, 46 Cal.3d at p. 275.) The court noted, in that context, that a variety of statutes impose rights and obligations on married people. One set of such imposed rights and obligations, for example, is Family Code sections 1100 through 1103, which both establish a fiduciary duty between spouses with regard to the management and control of community assets (Fam. Code, § 1100, subd. (e)) and provide for remedies for a breach of that duty (Fam. Code, § 1101).

It would be contrary to what our Supreme Court said in *Elden* and to the evident policy of the law to promote formal (as distinct from common law) marriage to impose fiduciary duties based on a common law marriage. Indeed, in the context of this case the potential for anomalous results is readily apparent. For example, in family law matters involving dissolution of marriage, punitive damages are not available to remedy breaches of fiduciary duty in the management and control of community property (though there are, of course, other remedies). Punitive damages, however, are sometimes available in other breach of fiduciary duty cases. (See, e.g., *Heller* v. *Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1390 [58 Cal.Rptr.2d 336].) It is unthinkable, given California's abolition of common law marriage, that an unmarried, cohabiting partner should have a more powerful remedy than a spouse.

That leaves contract, and the jury found there was no contract. Claire, despite the closeness of their relationship, never entrusted her *property* to Anthony; she only rendered services. And without entrustment of property, or an oral agreement to purchase property together, there can be no fiduciary relationship no matter how "confidential" a relationship between an unmarried, cohabiting couple. (*Toney* v. *Nolder* (1985) 173 Cal.App.3d 791, 796 [219 Cal.Rptr. 497].) Indeed, as the *Toney* decision points out, it takes clear and convincing evidence of such entrustment or an agreement to buy property together (*ibid.*, citing Evid. Code, § 662) to overcome the presumption of title—and, as previously mentioned, there is no dispute that title to the stock of Mag Instrument, Inc., was taken solely in Anthony's name. Here,

because the jury affirmatively found there were no such agreements, we need not even address the question of whether the evidence was "clear and convincing."[3]

B. *Quantum Meruit Allows Recovery for the Value of Beneficial Services, Not the Value by Which Someone Benefits From Those Services*

██ The absence of a contract between Claire and Anthony, however, would not preclude her recovery in quantum meruit: As every first year law student knows or should know, recovery in quantum meruit does not require a contract. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 112, p. 137; see, e.g., *B.C. Richter Contracting Co.* v. *Continental Cas. Co.* (1964) 230 Cal.App.2d 491, 499-500 [41 Cal.Rptr. 98].)[4]

██ The classic formulation concerning the measure of recovery in quantum meruit is found in *Palmer* v. *Gregg, supra*, 65 Cal.2d 657. Justice Mosk, writing for the court, said: "The measure of recovery in *quantum meruit* is the reasonable value of the services rendered *provided* they were of direct benefit to the defendant." (*Id.* at p. 660, italics added; see also *Producers Cotton Oil Co.* v. *Amstar Corp.* (1988) 197 Cal.App.3d 638, 659 [242 Cal.Rptr. 914].)

The underlying idea behind quantum meruit is the law's distaste for unjust enrichment. If one has received a benefit which one may not justly retain, one should "restore the aggrieved party to his [or her] former position by return of the *thing* or its *equivalent* in money." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 91, p. 122.)

---

[3]Claire attempts to distinguish *Toney* on the ground that the plaintiff there did not seek damages, but to establish his rights in a particular piece of real property. It is a distinction without a difference. The *Toney* court relied on section 662 of the Evidence Code, which consists of two sentences, neither of which are limited to just *real* property: "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." There is no difference, in substance, between asserting that an unmarried partner has breached a fiduciary duty to hold property— not just real property—in trust for the other and asserting direct rights in that property. In either case, the critical feature is whether the unmarried partner ever agreed to act as trustee in the first place. On that point the jury sided with Anthony, not Claire. Claire never quite explains how Anthony could breach a fiduciary duty to her without first having a contract to either hold property on her behalf or to own property jointly with her.

In *Weiner* v. *Fleischman* (1991) 54 Cal.3d 476 [286 Cal.Rptr. 40, 816 P.2d 892], the Supreme Court distinguished *Toney* from a case of fraudulent concealment. (*Id.* at p. 486.) In the case before us there is no fraudulent concealment because Anthony never agreed to hold property for Claire.

[4]The doctrine can become trickier when an actual contract is involved. (See *Hedging Concepts, Inc.* v. *First Alliance Mortgage Co., supra*, 41 Cal.App.4th 1410, 1419-1420 [quantum meruit recovery cannot conflict with terms of actual contract between parties, lest the court in effect impose its own ideas of a fair deal on the parties].)

The idea that one must be *benefited* by the goods and services bestowed is thus integral to recovery in quantum meruit; hence courts have always required that the plaintiff have bestowed some benefit on the defendant as a prerequisite to recovery. (See *Earhart* v. *William Low Co., supra,* 25 Cal.3d 503, 510 [explaining origins of quantum meruit recovery in actions for recovery of money tortiously retained; law implied an obligation to restore " 'benefit,' unfairly retained by the defendant"].)

But the threshold requirement that there be a benefit from the services can lead to confusion, as it did in the case before us. It is one thing to require that the defendant be benefited by services,[5] it is quite another to *measure* the reasonable value of those *services* by the value by which the defendant was "benefited" as a *result* of them.[6] Contract price and the reasonable value of services rendered are two separate things; sometimes the reasonable value of services exceeds a contract price. (See *B. C. Richter Contracting Co.* v. *Continental Cas. Co., supra,* 230 Cal.App.2d at p. 500.) And sometimes it does not.

At root, allowing quantum meruit recovery based on "resulting benefit" of services rather than the reasonable value of beneficial services affords the plaintiff the best of both contractual and quasi-contractual recovery. Resulting benefit is an open-ended standard, which, as we have mentioned earlier, can result in the plaintiff obtaining recovery amounting to de facto ownership in a business all out of reasonable relation to the value of services rendered. After all, a particular service timely rendered can have, as Androcles was once pleasantly surprised to discover in the case of a particular lion, disproportionate value to what it would cost on the open market.

The facts in this court's decision in *Passante* v. *McWilliam* (1997) 53 Cal.App.4th 1240 [62 Cal.Rptr.2d 298] illustrate the point nicely. In *Passante,* the attorney for a fledgling baseball card company gratuitously arranged a needed loan for $100,000 at a crucial point in the company's history; because the loan was made the company survived and a grateful board promised the attorney a 3 percent equity interest in the company. The company eventually became worth more than a quarter of a billion dollars, resulting in the attorney claiming *$33 million* for his efforts in arranging but

---

[5]Or, as the case may be, goods. However, in the present case we are only dealing with Claire's services.

[6]Here is the exact language of the plaintiff's jury instruction at issue: "Plaintiff may be compensated for the reasonable value of services rendered to Defendant and Mag Instrument, Inc. either by awarding Plaintiff: [¶] 1. The reasonable value of what it would have cost Defendant to obtain the services Plaintiff provided from another person; or [¶] 2. The value by which Defendant has benefited as a result of the services rendered by Plaintiff."

a single loan. This court would later conclude, because of the attorney's duty to the company as an attorney, that the promise was unenforceable. (See *id.* at pp. 1247-1248.) Interestingly enough, however, the one cause of action the plaintiff in *Passante* did not sue on was quantum meruit; while this court opined that the attorney should certainly get paid "something" for his efforts, a *$33 million* recovery in quantum meruit would have been too much. Had the services been bargained for, the going price would likely have been simply a reasonable finder's fee. (See *id.* at p. 1248.)

The jury instruction given here allows the value of services to depend on their *impact* on a defendant's business rather than their reasonable value. True, the services must be of benefit if there is to be any recovery at all; even so, the benefit is not necessarily related to the reasonable value of a particular set of services. Sometimes luck, sometimes the impact of others makes the difference. Some enterprises are successful; others less so. Allowing recovery based on resulting benefit would mean the law imposes an exchange of equity for services, and that can result in a windfall—as in the present case—or a serious shortfall in others. Equity-for-service compensation packages are extraordinary in the labor market, and always the result of specific bargaining. To impose such a measure of recovery would make a deal for the parties that they did not make themselves. If courts cannot use quantum meruit to change the terms of a contract which the parties did make (see *Hedging Concepts, Inc.* v. *First Alliance Mortgage Co., supra,* 41 Cal.App.4th at p. 1420), it follows that neither can they use quantum meruit to impose a highly generous and extraordinary contract that the parties did not make.

The cases relied on by Claire for an equity measure of the value of her services are inapposite. *Earhart* v. *William Low Co., supra,* 25 Cal.3d 503 concerned the nature of the benefit requirement. The court merely held, relaxing the benefit requirement as set out in a previous case (*Rotea* v. *Izuel* (1939) 14 Cal.2d 605 [95 P.2d 927, 125 A.L.R. 1424]), that where the defendant urged the plaintiff to render services to a third party (the third party owned a parcel of property which was being developed along with defendant's parcel) the plaintiff could still be compensated in quantum meruit for those services. *Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 24-25 [94 Cal.Rptr. 904] involved the reasonable value of storage costs incurred by a holdover tenant. To the degree that the court opined on the measure of value of storage costs, the *Gray* court made the unremarkable observation that a court could look to either the amount a landlord pays to have property stored offsite in a regulated warehouse, or the comparable charge he would pay if the landlord did not use a regulated warehouse. (*Id.* at p. 25.)

*Watson* v. *Wood Dimension, Inc.* (1989) 209 Cal.App.3d 1359 [257 Cal.Rptr. 816] is a little closer, because it allowed a recovery based on a contemplated commission. But it is still off the mark because the commission was specifically *agreed to* by the parties.

In *Watson* a stereo speaker manufacturer hired the friend of a lost customer to wine and dine the customer's general manager. The parties orally *agreed* that the friend would be paid 3 percent commission, but they didn't agree on how long the commission might extend after the plaintiff was terminated from employment. As this court noted, there is no reason a court may not consider an *agreed price* when ascertaining the reasonable value of services. (209 Cal.App.3d at p. 1365.) Of course, in the case before us, there was no agreement and no agreed price.

The same applies to the attorney contingent fee cases, of which *Cazares* v. *Saenz* (1989) 208 Cal.App.3d 279 [256 Cal.Rptr. 209] features most prominently in Claire's argument. As in *Watson*, a recovery of what was a share of an enterprise passed muster because the parties had *already agreed* to such valuation. In *Cazares* it was a standard one-third contingency fee which had to be shared between the attorneys who made that deal with the client and other attorneys with whom they later associated. "Fortunately, when an attorney partially performs on a contingency fee contract," said the court, "we already have the parties' agreement as to what was a reasonable fee for the entire case." (*Cazares, supra,* 208 Cal.App.3d at p. 288.)

Telling the jury that it could measure the value of Claire's services by "[t]he value by which Defendant has benefited as a result of [her] services" was error. It allowed the jury to value Claire's services as having bought her a de facto ownership interest in a business whose owner never agreed to give her an interest. On remand, that part of the jury instruction must be dropped.

### C. *Claire's Quantum Meruit Claim Is Not Barred by the Statute of Limitations*

The statute of limitations for quantum meruit claims is two years (see Code Civ. Proc., § 339 [action upon an "obligation" . . . not founded upon an instrument of writing]), but Claire seeks payment for services rendered since 1971. Anthony contends that her claim for all but the last two years' worth of services must necessarily fail in light of that fact; Claire argues that the statute of limitations only began to run with the termination of her services. The problem presents the challenge of parsing the exact

nature of the circumstances in a particular case (see *Robinson* v. *Chapman* (1929) 98 Cal.App. 278, 281 [276 P. 1081]), since fine gradations can lead to wildly divergent results, as illustrated by two very similar cases to this one from a bygone era, *Mayborne* v. *Citizens T. & S. Bank* (1920) 46 Cal.App. 178 [188 P. 1034] and *Corato* v. *Estate of Corato* (1927) 201 Cal. 155 [255 P. 825]. Claire is not the first person without a contract or marriage to devote his or her efforts to a fellow cohabitant and later seek compensation for them.

In *Mayborne*, the plaintiff cared for a well-to-do gentleman with the understanding that she would get paid the reasonable value of her services upon their termination and the gentleman's death. (See *Mayborne* v. *Citizens T. & S. Bank, supra*, 46 Cal.App. at p. 181.) The statute of limitations did not restrict her claim because the parties' understanding showed an expectation of payment upon termination. (*Ibid.*)[7] Hence she could sue for the lot.

By contrast, the lack of an expectation of payment on termination made all the difference in *Corato*, where the plaintiff worked in her cohabitant's board and lodging house, with no expectation of payment on termination. Rather, the plaintiff regularly sought *immediate* payment for her services, but would end up going away mollified with an indication that she would get paid "sometime." (See *Corato* v. *Estate of Corato, supra*, 201 Cal. at p.160.) This went on for something like 20 years, until the cohabitant died. Under those circumstances, said the high court, the presumption that an employee is hired by the month controlled, and therefore any right of action accrued with each passing month, hugely reducing the plaintiff's recovery. (*Id.* at pp. 160-161.) The plaintiff was entitled to only the last two years' worth.

As one might guess, Anthony stresses the applicability of the *Corato* decision to the case before us while Claire trumpets *Mayborne*. On reflection, Claire has the better part of this argument, as illustrated by yet a third case, *Lazzarevich* v. *Lazzarevich* (1948) 88 Cal.App.2d 708 [200 P.2d 49]. While the fact that Claire had a "common law marriage" is fatal to her fiduciary duty claims, *Lazzarevich* demonstrates why any expectation of compensation for her efforts would be at the termination of the relationship.[8]

In *Lazzarevich*, a couple got married, then the husband filed for a divorce, but there was a reconciliation. However, without the husband's knowledge a

---

[7]One typical scenario for payment on termination is when services are rendered to an elderly person with the expectation that recompense will come from the person's estate. In such cases the statute of limitations does not begin to run until termination. (E.g., *O'Brien* v. *Fitzsimmons* (1960) 183 Cal.App.2d 231, 234 [6 Cal.Rptr. 627]; *Robinson* v. *Chapman, supra*, 98 Cal.App. at pp. 280-281.)

[8]The domestic and familial nature of the relationship in this case distinguishes it from cases like *Johnstone* v. *E & J Mfg. Co.* (1941) 45 Cal.App.2d 586 [114 P.2d 658], which held that

final decree of divorce was entered. When the couple finally did split up, the wife sought recovery for the reasonable value of the services she rendered her husband during the period she lived with him under the mistaken belief that they were still married. (See *Lazzarevich* v. *Lazzarevich, supra,* 88 Cal.App.2d at p. 713.) The trial court awarded her only the last two years, but the appellate court modified the judgment to increase her recovery fourfold. (See *id.* at pp. 722-723.)[9] The core of the court's reasoning was that because the plaintiff had rendered her services under the mistaken belief that her marriage was valid, it was "obvious" that any cause of action could not have accrued until she discovered her marriage was invalid. (See *id.* at pp. 721-722.) The fictitious implied promise to pay for the services inherent in the relationship entailed another fictitious implied promise to pay at termination of the services. (See *ibid.*)

*Lazzarevich* reflects the contours of Claire and Anthony's own relationship here. They might not have been married, but they certainly acted married. While the special solicitude the law shows for formal marriage and putative relationships (i.e., where a person believes, in good faith, that he or she is married) means that Claire did not acquire the same substantive rights as a married person (see *Elden* v. *Sheldon, supra,* 46 Cal.3d at p. 275), the "common law marriage" nature of her relationship with Anthony certainly shows that, *like a married person,* any need to sue to assert whatever rights she did have would be expected to accrue at the termination of the relationship, not when some hypothetical paycheck might ordinarily come due.

Any other result simply does not accord with the reality of the situation as the parties experienced it. Accordingly, on remand, the statute of limitations will not limit Claire's quantum meruit claim.

### D. *Certain Jury Instructions May Have Misled the Jury Into Finding There Was No Implied Contract When in Fact There Was One*

 As we have shown, the quantum meruit damage award cannot stand in the wake of the jury's finding that Claire and Anthony had no agreement to share the equity in Anthony's business. But the validity of that very finding itself is challenged in Claire's protective cross-appeal, where she attacks a series of five jury instructions, specially drafted and proferred by

---

the obligation to pay for certain professional and technical services rendered by a bought-out former partner began to accrue as the services were rendered. (See *id.* at p. 588.)

[9]The trial court had conveniently made findings as to the value of the plaintiff's services during the relevant period.

Anthony.[10] These instructions are set out in the margin.[11] We agree with Claire that it was error for the trial court to give three of these five instructions.[12] The three instructions are so infelicitously worded that they might have misled the jury into concluding that evidence which can indeed support a finding of an implied contract could not.

The problem with the three instructions is this: They isolate three uncontested facts about the case: (1) living together, (2) holding themselves out to others as husband and wife, (3) providing services "such as" being a constant companion and confidant—and, seriatim, tell the jury that these facts definitely do not mean[13] there was an implied contract. True, none of these facts *by themselves and alone* necessarily *compels* the conclusion that there was an implied contract. But that does not mean that these facts cannot, in conjunction with all the facts and circumstances of the case, establish an implied contract. In point of fact, they can.

■ Unlike the "quasi-contractual" quantum meruit theory which operates *without* an actual agreement of the parties, an implied-in-fact contract entails an actual contract, but one manifested in conduct rather than expressed in words. (See *Silva* v. *Providence Hospital of Oakland* (1939) 14 Cal.2d 762, 773 [97 P.2d 798] ["The true implied contract, then, consists of obligations arising from a mutual agreement and intent to promise where the

---

[10]We are aware of no standard jury instructions dealing directly with implied contracts arising out of cohabitation between unmarried people.

[11]Here are the five:

"1. NO CONTRACT RESULTS FROM PARTIES HOLDING THEMSELVES OUT AS HUSBAND AND WIFE

"You cannot find an agreement to share property or form a partnership from the fact that the parties held themselves out as husband and wife. The fact that unmarried persons live together as husband and wife and share a surname does not mean that they have any agreement to share earnings or assets.

"2. NO IMPLIED CONTRACT FROM LIVING TOGETHER

"You cannot find an implied contract to share property or form a partnership simply from the fact that the parties lived together[.]

"3. CREATION OF AN IMPLIED CONTRACT

". . . The fact the parties are living together does not change any of the requirements for finding an express or implied contract between the parties.

"4. COMPANIONSHIP DOES NOT CONSTITUTE CONSIDERATION

"Providing services such as a constant companion and confidant does not constitute the consideration required by law to support a contract to share property, does not support any right of recovery and such services are not otherwise compensable.

"5. OBLIGATIONS IMPOSED BY LEGAL MARRIAGE

"In California, there are various obligations imposed upon parties who become legally and formally married. These obligations do not arise under the law merely by living together without a formal and legal marriage."

[12]The third and fifth instructions in footnote 11 are simple truisms.

[13]The first instruction says "does not" mean there is an agreement, the second says the jury "cannot find" an "implied" agreement, and the fourth says "does not support any right."

agreement and promise have not been expressed in words."]; *McGough* v. *University of San Francisco* (1989) 214 Cal.App.3d 1577, 1584 [263 Cal.Rptr. 404] ["An implied-in-fact contract is one whose existence and terms are manifested by conduct."]; 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 11, p. 46 ["The distinction between *express* and *implied in fact* contracts relates only to the *manifestation of assent*; both types are based upon the expressed or apparent intention of the parties."].)[14]

■ In *Alderson* v. *Alderson* (1986) 180 Cal.App.3d 450, 461 [225 Cal.Rptr. 610], the court observed that a number of factors, *including*

—direct testimony of an agreement;

—holding themselves out socially as husband and wife;

—the woman and her children's taking the man's surname;

—pooling of finances to purchase a number of joint rental properties;

—joint decisionmaking in rental property purchases;

—rendering bookkeeping services for, paying the bills on, and collecting the rents of, those joint rental properties; and

—the nature of title taken in those rental properties

—could all support a finding there was an implied agreement to share the rental property acquisitions equally.

■ We certainly do not say that living together, holding themselves out as husband and wife, and being companions and confidants, even taken

---

[14]Because an implied-in-fact contract can be found where there is no expression of agreement in *words*, the line between an implied-in-fact contract and recovery in quantum meruit—where there may be no actual agreement at all—is fuzzy indeed. We will not attempt, in dicta, to clear up that fuzziness here. Suffice to say that because quantum meruit is a theory which implies a promise to pay for services as a *matter of law for reasons of justice* (*Hedging Concepts, Inc.* v. *First Alliance Mortgage Co., supra*, 41 Cal.App.4th at p. 1419), while implied-in-fact contracts are predicated on actual agreements, albeit not ones expressed in words (*Silva* v. *Providence Hospital of Oakland, supra*, 14 Cal.2d at p. 773; *McGough* v. *University of San Francisco, supra*, 214 Cal.App.3d at p. 1584), recovery in quantum meruit is necessarily a different theory than recovery on an implied-in-fact contract. (Cf. 1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 112, pp. 137-138 [noting uncertainty created by decisions which were not clear about whether quantum meruit was based on implied-in-law or implied-in-fact contracts].)

Neither do we address the quantum of proof necessary to support recovery on a quantum meruit theory or attempt to divine the dividing line between services which may be so gratuitously volunteered under circumstances in which there can be no reasonable expectation of payment and services which do qualify for recovery in quantum meruit. These matters have not been briefed and may be left for another day.

**BELOW IS A PASTE-OVER CRACK-AND-PEEL INSERT FOR CORRECTION OF AN ERROR IN THE BOUND VOLUME REPORT OF MAGLICA v. MAGLICA (1998) 66 CAL.APP.4th 442, AT PAGE 457, ON LINE 1 OF THE LAST PARAGRAPH ON THE PAGE.**

Please remove the correction insert from the peel-off backing and position it to cover the last paragraph on page 457.

Petitions for a rehearing were denied September 28, 1998, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 16, 1998. George, C. J., did not participate therein.

together, are *sufficient in and of themselves* to show an implied agreement to divide the equity in a business owned by one of the couple. However, *Alderson* clearly shows that such facts, together with others bearing more directly on the business and the way the parties treated the equity and proceeds of the business, *can* be part of a series of facts which do show such an agreement. The vice of the three instructions here is that they affirmatively suggested that living together, holding themselves out, and companionship could not, as a matter of law, even be *part* of the support for a finding of an implied agreement. That meant the jury could have completely omitted these facts when considering the other factors which might also have borne on whether there was an implied contract.

On remand, the three instructions should not be given. The jury should be told, rather, that while the facts that a couple live together, hold themselves out as married, and act as companions and confidants toward each other do not, by themselves, show an implied agreement to share property, those facts, when taken together and in conjunction with other facts bearing more directly on the alleged arrangement to share property, can show an implied agreement to share property.

## Disposition

The judgment is reversed. The case is remanded for a new trial. At the new trial the jury instructions identified in this opinion as erroneous shall not be given. In the interest of justice both sides will bear their own costs on appeal.

Wallin, J., and Crosby, J., concurred.

On September 28, 1998, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied December 16, 1998. George, C. J., did not participate therein.