[No. D006141. Fourth Dist., Div. One. Feb. 28, 1989.]

ROY CAZARES et al., Plaintiffs and Appellants, v.
PHIL SAENZ, Defendant and Appellant.

**COUNSEL**

William O. Ward III and Solomon, Ward, Seidenwurm & Smith for Plaintiffs and Appellants.

Suuzen Ty Anderson for Defendant and Appellant.

**OPINION**

**WIENER, Acting P. J.**—On one level, the issue in this case is simply one of attorney's fees. Are plaintiffs Roy Cazares and Thomas Tosdal, former partners in the law firm of Cazares & Tosdal, entitled to one-half of a

contingent fee promised them by defendant Phil Saenz when he associated the firm on a particular personal injury case, notwithstanding that Cazares became a municipal court judge before the case was settled? More fundamentally, however, the issue before us requires that we review not only the nature of contingent attorney fee arrangements but also basic contract law regarding frustration of purpose, incapacitation of parties to a contract, and the proper measure of quantum meruit recovery in such circumstances.

We decide that where one member of a two-person law firm becomes incapable of performing on a contract of association with another lawyer, the obligations of the parties to the contract are discharged if it was contemplated that the incapacitated attorney would perform substantial services under the agreement. We therefore hold that Cazares and Tosdal are not entitled to 50 percent of the contingent fee as provided in the association agreement. They may, however, recover the reasonable value of the legal services rendered before Cazares's incapacitation, prorated on the basis of the original contract price.

### FACTUAL AND PROCEDURAL BACKGROUND

Defendant Phil Saenz was an attorney of limited experience in November 1978 when he was contacted by the Mexican consulate in San Diego regarding a serious accident involving a Mexican national, Raul Gutierrez.[1] Gutierrez had been burned after touching a power line owned by San Diego Gas & Electric Company (SDG&E). He retained Saenz to represent him in a lawsuit against SDG&E and other defendants. The written retainer agreement authorized Saenz to "retain co-counsel if he deems it necessary" and provided that "[a]ttorney fees shall be 33 ⅓% of the net recovery; i.e., after all costs and medical expenses."

Saenz shared office space with the law firm of Cazares & Tosdal, which was composed of partners Roy Cazares and Thomas Tosdal, the plaintiffs in this action.[2] In September 1979, Saenz agreed with Cazares to associate Cazares & Tosdal on the Gutierrez case. According to Saenz, he wanted to work with Cazares because Cazares spoke Spanish and could communicate directly with Gutierrez and because he (Saenz) respected Cazares's work in

---

[1] Saenz had been previously employed in a nonlawyer capacity by the San Diego District Attorney's Office. In that context he had worked with the Mexican consulate on a variety of matters.

[2] The law firm of Cazares & Tosdal originally assigned its rights under the association agreement with Saenz to the law firm of Sullivan & Jones which in turn assigned its rights to the law firm of Page, Tucker & Brooks. Page, Tucker & Brooks filed the first amended complaint and, as a result, the caption of the case in the superior court read Page, Tucker & Brooks v. Saenz. While the case was pending in the superior court, Page, Tucker & Brooks assigned its rights back to Roy Cazares and Thomas Tosdal as individuals and judgment was entered in their favor. Accordingly, we have corrected the caption to read as printed above.

the Mexican-American community.[3] In contrast, Saenz did not feel comfortable with Tosdal: "Basically, he was an Anglo, a surfer. In my opinion, he was just too liberal for me . . . ." Saenz testified he had no reason to doubt Tosdal's competence as a lawyer.[4] In fact, Saenz did not object to Tosdal's working on the case as long as he (Saenz) had nothing to do with him.

Cazares, on behalf of his firm, and Saenz agreed Saenz would continue to maintain client contact with Gutierrez and would handle a pending immigration matter to prevent Gutierrez from being deported. Saenz also wanted to actively assist in the preparation and trial of the case as a learning experience. Cazares & Tosdal was to handle most of the legal work on the case. Saenz and Cazares orally agreed they would evenly divide the contingent fee on the Gutierrez case.[5] Both Cazares and Saenz testified they expected and assumed Cazares would prosecute the case to its conclusion.

Gutierrez's complaint filed in November 1979 listed both Saenz and Cazares & Tosdal as counsel of record. During the next two and one-half years, Cazares performed most of the legal work in the case. Saenz maintained client contact, performed miscellaneous tasks and attended depositions including some defense depositions which Cazares did not attend. For all intents and purposes Tosdal performed no work on the case. Neither Cazares nor Saenz kept time records.

In June 1981, the Cazares & Tosdal partnership dissolved. The two partners decided to retain some cases, including the Gutierrez matter, as partnership assets. No formal substitution of counsel was filed in the case. Cazares and Saenz moved to a new office and continued to work on the case together for the next year.

In May 1982 Cazares was appointed a municipal court judge. Cazares urged Saenz to seek Tosdal's help in prosecuting the Gutierrez case. Saenz refused. In January 1983 Tosdal wrote Saenz stating that he remained "ready, willing and available to assist you in any aspect of the preparation of the case in which you may desire my aid."

---

[3] Saenz testified: "I trusted Roy. He spoke Spanish. He had experience like I had in the community. I know he was sympathetic and what else could I want, Harvard graduate, bright man, so forth. I knew he had a future, and I figure, 'Hey, this is a great guy, we have a lot in common. This is a guy I want to team up with at least through this case. We're compatible . . . .'"

[4] Like Cazares, Tosdal attended Harvard Law School, graduating cum laude in 1975.

[5] Rules of Professional Conduct, rule 2-108, in effect at the time of the association agreement, provided that any agreement between lawyers to divide a fee must be consented to in writing by the client after full disclosure. Because this rule exists for the benefit of the client, who is not a party to this proceeding, we offer no further comment on the parties' failure to comply with this requirement.

Saenz never responded to Tosdal's offer. Instead, he associated an experienced personal injury attorney, Isam Khoury, to assist him on the Gutierrez case. Saenz also hired a young attorney, Dan Mazella, to do some research work.

In April 1983, Saenz settled the Gutierrez case for $1.1 million, entitling him to a fee slightly in excess of $366,000. Out of that fee, Saenz paid Khoury $40,000 and Mazella $7,000 for their work on the case. About two weeks later, Saenz visited Cazares and offered to pay him $40,000 for his work on the case. Cazares declined, claiming Saenz owed the now defunct Cazares & Tosdal partnership more than $183,000. This litigation ensued.

The case was tried to a referee by stipulation. (See Code Civ. Proc., § 638.) The referee concluded in pertinent part as follows: "The partnership of Tosdal and Cazares entered into an agreement with Saenz, which was in effect a joint venture agreement. The partnership performed fully up until the time Cazares took the bench. At that time, Saenz rejected any help from the remaining partner, therefore preventing the performance by the partnership in further prosecution of the case. The case of *Jewel* v. *Boxer,* 156 Cal.App.3d 171 would appear to govern. The joint venture entered into by [the] partnership [with] Saenz entitled the partnership to receive 50% of the fees received by Defendant Saenz." The referee went on to conclude that Saenz was entitled to deduct the $47,000 paid to Khoury and Mazella before calculating the 50 percent due Cazares and Tosdal. Accordingly, judgment was entered in favor of Cazares and Tosdal in the amount of $159,833.00 plus interest.

## DISCUSSION

### I

■ The initial question is whether Saenz breached the association agreement with Cazares & Tosdal when, after Cazares's appointment to the municipal court, he refused to work with Tosdal on the Gutierrez case. Here, the referee in effect held that Saenz was *obligated* to accept Tosdal as a substitute for Cazares even though the record firmly establishes both parties to the association agreement contemplated that most if not all of the work on the Gutierrez case would be performed by Cazares. We conclude that Saenz acted within his rights in refusing to work with Tosdal after Cazares became a judge.[6]

---

[6] In support of his conclusions, the referee cited *Jewel* v. *Boxer* (1984) 156 Cal.App.3d 171 [203 Cal.Rptr. 13]. *Jewel* involved the dissolution of a law partnership and the rights of the partners to contingent fees in cases prosecuted to successful completion by some of the dissolving partners. The *Jewel* court held that in the absence of an agreement to the contrary, the partnership continued for the purposes of completing and collecting fees on all cases

Where a contract contemplates the personal services of a party, performance is excused when that party dies or becomes otherwise incapable of performing. (Rest.2d Contracts, §§ 261, 262; 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 782, p. 705.) ■ Here, the parties contemplated Cazares would personally perform the firm's obligations under the contract with Saenz, which he in fact did for two and one-half years after the execution of the contract. Cazares became legally incapable of performing the contract after his appointment to the bench. (See *State Bar of California* v. *Superior Court* (1929) 207 Cal. 323, 337 [278 P. 432].) Of course, the contract was not between Saenz and Cazares but between Saenz and the firm of Cazares & Tosdal; thus, performance by the firm was not technically impossible. Nonetheless, the Restatement Second of Contracts, section 262 addresses this issue because its language is not limited to the death or incapacity of a *party* to the contract: "If the existence of *a particular person* is necessary for the performance of a duty, his death or such incapacity as makes performance impracticable is an event the non-occurrence of which was a basic assumption on which the contract was made."[7] (Italics added.) Here, both Saenz and Cazares testified that Cazares's prosecution of the case to completion was a "basic assumption on which the contract was made."

We have been unable to locate any cases—California or otherwise—addressing this issue in the context of an association agreement between lawyers. A similar situation occurs, however, whenever a client hires a firm of lawyers with the expectation of obtaining the services of a particular attorney. ■ Of course under California law, a client may discharge an attorney at any time for any reason; there is no requirement that the discharge be for "cause." The client's only obligation is to compensate the discharged attorney in quantum meruit for the reasonable value of any services rendered. (*Fracasse* v. *Brent* (1972) 6 Cal.3d 784, 790-791 [100 Cal.Rptr. 385, 494 P.2d 9].) Thus, if the relationship with Cazares & Tosdal had been terminated by Gutierrez rather than Saenz, there would be no question that the termination was proper.

---

existing at the time of dissolution. There was no issue in the case as to the circumstances which would justify one attorney in refusing to continue working on a case with another attorney or firm with whom he had associated. Nor was there any discussion by the court as to how to measure the reasonable value of legal services rendered under a contingent fee contract where complete performance is made impossible or impracticable by an unforeseen event.

[7] Restatement Second of Contracts, section 262 describes a specific type of impracticability of performance supplementing the general statement of the rule in section 261: "Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary."

It is unnecessary in this case for us to decide whether the rights of an attorney acting on behalf of the client in associating other counsel mirror the client's broad rights under *Fracasse*. Even before *Fracasse,* when good cause was required to discharge an attorney (see *Zurich G. A. & L. Ins. Co., Ltd.* v. *Kinsler* (1938) 12 Cal.2d 98, 100-101 [81 P.2d 913]; *Baldwin* v. *Bennett* (1854) 4 Cal. 392, 393), the rule was that where a client contracts with a law firm to obtain the services of a particular attorney and that attorney dies or becomes incapacitated, the client at his option may discharge the firm subject only to the obligation to compensate the firm for the reasonable value of services rendered before the discharge. (See *Little* v. *Caldwell* (1894) 101 Cal. 553, 559-560 [36 P. 107]; see also, e.g., *Felt* v. *Mitchell* (1909) 44 Ind.App. 96 [88 N.E. 723, 723-724]; *Clifton* v. *Clark, Hood & Co.* (1904) 83 Miss. 446 [36 So. 251, 253]; *Green County* v. *Lewis* (1914) 157 Ky. 490 [163 S.W. 489, 493]; Speiser, Attorneys' Fees (1973) § 4:44, p. 196.) **(1c)** We see no reason why a similar rule should not apply when an attorney on behalf of a client enters into an association agreement with another firm of lawyers. A lawyer who associates a firm on a specific case in order to obtain the services of a particular professional colleague is certainly no less likely than the client to be relying on that colleague's unique legal talents. Here, in fact, Gutierrez specifically delegated to Saenz the discretion to associate co-counsel "if he deem[ed] it necessary." (*Ante,* p. 282.)

It may be helpful to consider a hypothetical situation in which the roles here were reversed, i.e., if Saenz sought to compel Tosdal to perform after Cazares was appointed to the bench. One of the illustrations to Restatement Second of Contracts, section 262 addresses this precise situation, stating the rule that the death or incapacity of one partner discharges the firm's obligations under the contract.[8] At least where the contract contemplates the unique personal services of a firm member, the rationale of the illustration necessarily leads to the conclusion that the obligations of the party retaining the firm are also discharged in such a situation.

## II

Our decision requires that we remand the case to the trial court for a determination of the reasonable value of the services rendered by Cazares & Tosdal on the Gutierrez case. (See Rest.2d Contracts, § 377; *Fracasse* v. *Brent, supra,* 6 Cal.3d at p. 791.) Because the hourly fee is the prevailing price structure in the legal profession, it is sometimes assumed that the

---

[8] Illustration number 8 reads as follows: "A and B, a firm of architects, contract with C to design a building for C. It is understood by the parties that both A and B shall render services under the contract. A dies and B fails to complete performance. Both A's and B's duties to design the building are discharged, and neither A's estate nor B is liable to C for breach of contract."

quantum meruit standard applied to legal services includes nothing more than a reasonable hourly rate multiplied by the amount of time spent on the case. (See, e.g., *Paolillo* v. *American Export Isbrandtsen Lines, Inc.* (S.D.N.Y. 1969) 305 F.Supp. 250, 253-254.) As even Saenz's counsel candidly recognizes, however, this is an overly narrow view of the quantum meruit standard applied in the context of a contingent fee agreement which, through no fault of either party, could not be performed.

## A

■ As a matter of professional responsibility, California lawyers are entitled to charge clients no more than a reasonable fee for legal services. (Rules Prof. Conduct, rule 2-107.) What is reasonable in a given case depends on a host of circumstances. (*Ibid.*) Moreover, there may be a significant difference between what is reasonable in the context of a negotiated fee and the otherwise calculated reasonable value of legal services rendered. (Aronson, Attorney-Client Fee Arrangements: Regulation and Review (Federal Judicial Center 1980) pp. 18-19.) A party to a contract may agree to pay a higher-than-market price for services, but where the bargaining process is a fair one, courts traditionally defer to the parties' agreement as the best measure of the value of the contract performance. (*Ibid.*)

The hourly fee is the standard price structure in the legal profession. (See Schwartz & Mitchell, *An Economic Analysis of the Contingent Fee in Personal-Injury Litigation* (1970) 22 Stan.L.Rev 1125.) Where a lawyer normally charges for work on the basis of an hourly fee, it is a fairly simple matter to calculate the reasonable value of services rendered even in the absence of a negotiated fee. The lawyer's customary hourly rate can be evaluated by comparison to the rate charged by others in the legal community with similar experience. The number of hours expended by the lawyer can also be evaluated in light of how long it would have taken other attorney's to perform the same tasks. Properly evaluated and adjusted, the product of the hourly rate and the number of hours expended should yield the reasonable value of the work completed.

■ Where a lawyer has contracted to provide services in exchange for a contingent percentage fee, calculation of the reasonable value of services rendered in partial performance of the contract becomes a more complicated task. ■ It has been repeatedly recognized that a contingent fee " 'may properly provide for a larger compensation than would otherwise be reasonable.' " (*Rader* v. *Thrasher* (1962) 57 Cal.2d 244, 253 [18 Cal.Rptr. 736, 368 P.2d 360], quoting *Estate of Raphael* (1951) 103 Cal.App.2d 792, 796 [230 P.2d 436]; accord *Sincock* v. *Obara* (D.Del. 1970) 320 F.Supp.

1098, 1102, fn. 8.) This is because a contingent fee involves economic considerations separate and apart from the attorney's work on the case.

In addition to compensation for the legal services rendered, there is the raison d'etre for the contingent fee: the contingency. The lawyer on a contingent fee contract receives nothing unless the plaintiff obtains a recovery. Thus, in theory, a contingent fee in a case with a 50 percent chance of success should be twice the amount of a noncontingent fee for the same case. Usually, the fee is contingent not only on the ultimate success of the case but also on the amount recovered; that is, the fee is measured as a percentage of the total recovery. Thus, the lawyer runs the risk that even if successful, the amount recovered will yield a percentage fee which does not provide adequate compensation. (See Schwartz & Mitchell, *op. cit. supra,* 22 Stan.L.Rev. at p. 1125.)

Finally, even putting aside the contingent nature of the fee, the lawyer under such an arrangement agrees to delay receiving his fee until the conclusion of the case, which is often years in the future. The lawyer in effect finances the case for the client during the pendency of the lawsuit. (*Id.* at pp. 1125-1126.) If a lawyer was forced to borrow against the legal services already performed on a case which took five years to complete, the cost of such a financing arrangement could be significant.

 Where the calculation of an attorney's reasonable fee requires evidence and analysis of all these factors, it can be a formidable undertaking. (Cf. Third Circuit Task Force, *Court Awarded Attorney Fees* (1985) 108 F.R.D. 237, 246, 249.) Fortunately, when an attorney partially performs on a contingency fee contract, we already have the parties' agreement as to what was a reasonable fee for the entire case.[9] If the trial court can determine what portion of the contract was performed, calculating the reasonable value of that partial performance becomes a relatively simple procedure.

To determine the extent of partial performance, the trial judge must calculate a fraction where the numerator is the value of the legal services rendered by the particular attorney or firm at issue and the denominator is the aggregate value of all the legal services rendered by any attorney in the case. This may be as simple as adding up the total number of hours spent by all attorneys on the matter, but it is by no means limited to "straight time."

[9] Reliance on the agreed price necessarily assumes it was the product of arms-length negotiations and that the parties are of relatively equal bargaining power. (See generally *A & M Produce Co.* v. *FMC Corp.* (1982) 135 Cal.App.3d 473, 486-487 [186 Cal.Rptr. 114, 38 A.L.R.4th 1].) Such an assumption, as a general proposition, seems warranted where the agreement at issue is a contract of association between two attorneys. In any event, there is no contention to the contrary raised in this case.

The trial court may adjust the fraction upward or downward to account for difficulty of the work or other relevant factors.[10]

The fraction thus calculated represents the attorney's or firm's proportionate work on the case and, if multiplied by the total fee due under the contract, should yield a reasonable approximation of the proportional fee due the attorney or firm. In effect, then, the reasonable value of the services rendered is measured by the attorney's or firm's pro rata share of the contract price.[11]

### B

Thus far, we have indicated that in seeking quantum meruit recovery on a partially performed contingent fee contract, the attorney-plaintiff is not limited to recovering his hourly rate on whatever time has been spent on the case but rather is entitled to an increased amount reflecting the value of the contingency factors as well as the delay in receiving payment for his services. We have further suggested that this "enhanced" fee may be calculated by prorating the original contract price and awarding the appropriate proportion to the partially performing attorney or firm.

As we noted earlier, there may be a difference between a reasonable negotiated fee and the reasonable value of legal services calculated without reference to a negotiated price. (*Ante,* p. 287.) It necessarily follows there may be a similar difference between the pro rata contract price and the reasonable value of partially performed legal services. Where there is such a difference, the pro rata contract price has always been viewed as an upper limit on the amount which can be recovered on a restitution or quantum meruit theory. (See *Spires* v. *American Bus Lines* (1984) 158 Cal.App.3d 211, 216 [204 Cal.Rptr. 531]; Rest.2d Contracts, § 377, com. b, p. 225; Palmer, The Law of Restitution (1978) §§ 7.5, 7.7, pp. 127, 138.) The formula we propose, however, indicates that the pro rata contract price should control even where it *exceeds* the reasonable value of the services adjusted for the contingency factors and delayed payment considerations.[12] In that sense, it appears to be inconsistent with comment b and illustration

---

[10] For instance, where a second attorney is retained or associated to complete the case after a substantial amount of work has already been completed, the contingency facing the second attorney may well be less than faced the first attorney at the outset of the case; the anticipated delay in receiving payment will undoubtedly be less. These factors may require an adjustment in the proportions in favor of the first attorney.

[11] We recognize that this formula could also be applied in the partnership dissolution context to apportion contingent fees in cases which are prosecuted to successful completion by one or more of the former partners. (See, e.g., *Jewel* v. *Boxer, supra,* 156 Cal.App.3d 171; *Champion* v. *Superior Court* (1988) 201 Cal.App.3d 777 [247 Cal.Rptr. 624].) We have no occasion to comment on whether the formula *should* be applied in that type of situation.

[12] We do not intend to suggest that the fee in this case necessarily exceeded the reasonable value of the services rendered.

7 to Restatement section 377, which suggest that the pro rata measure should only furnish a limitation on recovery. This result derives, presumably, from a wooden application of the rule that because a claim for restitution is not a claim on the contract, the party rendering part performance is not entitled to recover any "expectation interest" in the profits from the contract. (See Rest.2d Contracts, § 344; see also *id.*, vol. 3, Introductory Note to Topic 4—Restitution, p. 199.)

In his treatise on restitution, Professor Palmer considers the Restatement position and concludes it "is not supported in the decisions, nor should it be." (Palmer, *supra*, § 7.5, p. 126.) Our research confirms this conclusion. Both case law and analysis by respected commentators indicate that the pro rata contract price is a proper measure even though it allows a party to recover the "benefit of the bargain." (*Clark* v. *Gilbert* (1863) 26 N.Y. 279; *Morton* v. *Forsee* (1913) 249 Mo. 409 [155 S.W. 765, 767-770]; *Johnston* v. *Board of Com'rs of Bernalillo County* (1904) 12 N.M. 237 [78 P. 43, 45]; *Fidelity Trust Co.* v. *Whitehall Cement Mfg. Co.* (1929) 295 Pa. 179 [144 A. 915]; *Ryan* v. *Dayton* (1856) 25 Conn. 188, 192-193; Palmer, *supra*, §§ 7.5, 7.7, pp. 125-127, 138-141; Dawson, *Restitution Without Enrichment* (1981) 61 B.U.L. Rev. 563, 589.) As Professor Palmer explains, "[The pro rata measure] awards plaintiff the economic advantage of the contract to the extent of his performance. When it is fair to do so, such an award is consistent with the principles of restitution. A benefit has been conferred and it is proper to measure its value, not by a general market standard, but by the standard adopted by the parties in their contract. While such a recovery has some of the marks of contract damages, there is a fundamental difference: contract damages allow recovery of an anticipated profit referable to unperformed portions of a contract, whereas the pro rata formula relates only to the performed portion." (Palmer, *op. cit. supra*, § 7.5, p. 126.)

Because "reasonable value" is such an amorphous concept, it makes no sense to ignore the best evidence of that value as expressed in the parties' agreement. Especially in this type of case, where the contract is between associated attorneys, an unforeseen event which renders complete performance by one party impossible should not result in a windfall to the other attorney.[13] In essence, having contracted with the lawyer or firm to pay a particular fee, the associating attorney is estopped to deny that the pro rata contract price accurately measures the reasonable value of the services rendered.[14]

---

[13] Because this case does not involve a client's retention of successive attorneys, we have no occasion to comment on Professor Palmer's suggestion that where a client must retain a second attorney to complete the case at an amount in excess of the pro rata contract price, the first attorney's recovery should be limited to the contract price less the amount of the second attorney's fee. (See Palmer, *supra*, § 7.7, p. 141.)

[14] This rule would be particularly salutary if the associating attorney possesses the same rights as the client to discharge an associated attorney without cause because it would elimi-

## III

We are familiar with and especially sensitive to the rules which govern the relationships among attorneys and between attorneys and clients. This sensitivity is the product not only of our experience as judges, continually exposed to the interaction among lawyers and between lawyers and clients, but also our prejudicial experience in the practice of law. We suspect that disputes over legal fees may sully whatever remains of the image of law as a noble "profession." The public may perceive the lawyer as simply another variety of business executive, concerned primarily with the bottom line. Realistically, however, neither archetype—business or profession—alone accurately describes the modern practice of law.

In crafting these rules, we must pragmatically recognize that the ability of lawyers to perform their important professional function in society is in the long run dependent on assurances they will be fairly compensated for their work. We believe the standards set forth in this case with respect to the discharge of an associated firm and the compensation of that firm for work performed prior to discharge appropriately consider and balance the interests of clients in effective representation and the financial interests of the various lawyers involved.

Our disposition makes it unnecessary for us to address Saenz's remaining contentions or Cazares's and Tosdal's arguments raised by way of their cross-appeal.

### DISPOSITION

The judgment is reversed. The case is remanded to the superior court for further proceedings consistent with this opinion.

Benke, J., and Nares, J., concurred.

---

nate any financial incentive to do so. (See *ante,* p. 285; see also *Fracasse* v. *Brent, supra,* 6 Cal.3d at p. 371.)