Filed 7/31/13  Sare v. Shad CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| CAROLE MARIE SARE, as Representative, etc., | |
| Plaintiff and Respondent, | C069573 |
| v. | (Super. Ct. No. SC20090115) |
| ANTONIA SHAD et al., | |
| Defendants and Appellants. | |

In this appeal, we consider whether a decedent attorney's estate may recover a contingency fee even though the attorney died before the legal services were completed by associated counsel.  The decedent attorney, Dale Sare, agreed to represent sisters Antonia Shad and Mary Tsouris in matters relating to the conservatorship and eventual probate of the estate belonging to their half brother, Dan Mathisen.  Under the contract for legal services, Sare was entitled to a third of any amount the sisters received from Mathisen's estate.  As Sare's own health declined, he delegated the remaining legal work to Tamara Mallery as allowed under the legal services contract.  Mallery completed the work after Sare died, and the sisters received a total of $822,941.16 from the estate.

1

Sare's wife and personal representative, Carole Marie Sare[1], sued for the contingency fee. Following a court trial, judgment was entered to award the contingency fee to Carole Marie. Shad and Tsouris appeal on grounds (1) Sare's death terminated the legal services contract, (2) Sare improperly associated counsel to complete the legal services under the contract, (3) the legal services contract was made between the sisters and Sare personally -– not Sare's corporate entity, (4) Sare remained their attorney of record only because his law practice was improperly wound down, (5) the legal services contemplated by the contract were not fulfilled, and (6) the contract was voidable for failure to comply with Probate Code sections 2644 and 10811,[2] which require prior court approval before an estate may be charged a contingency fee.

We conclude Sare's estate was entitled to the contingency fee even though Sare died before the successful completion of the Mathisen estate probate. As to association of counsel, the contract expressly conferred Sare with the right to delegate work to other attorneys. Sare's estate became entitled to the contingency fee when the sisters received their distribution from Mathisen's estate. We reject the arguments relating to the winding down of Sare's law practice and whether Sare's corporate entity was a party to the contract as factual contentions improperly raised for the first time on appeal. And, since the legal services contract was made for the benefit of Shad and Tsouris, not to the advantage of Mathisen's estate, compliance with sections 2644 and 10811 was unnecessary. Accordingly, we affirm the judgment.

---

[1]    Due to shared surname with the decedent and for the sake of clarity, we refer to decedent attorney's representative by first name.

[2]    Undesignated statutory references are to the Probate Code.

2

# FACTUAL AND PROCEDURAL HISTORY

## *The Contingency Fee Agreement*

In August 2004, Shad learned Mathisen had been hospitalized due to a fall. His physician reported Mathisen was so malnourished and dehydrated that Adult Protective Services had been contacted. The hospital indicated it would discharge Mathisen only to the care of an immediate relative. Shad traveled from her home in Michigan to California to take Mathisen back to his house. At Mathisen's house, Shad observed it was in disarray and he had no solid food in the refrigerator. Shad determined Mathisen would need assistance, and she inquired about who might help her obtain a power of attorney to care for him. Shad hired attorney Mark Nareau, who helped her obtain a durable power of attorney and become temporary conservator for Mathisen. Shad shared the durable power of attorney with Mathisen's friends, Steven Taylor and Thomas Weeks.

In January 2005, Nareau asked George Theobold to become Mathisen's permanent conservator after Shad was unable to secure the bond necessary to continue serving as conservator.

In August 2005, Mathisen retained attorney Eugene Chittock because he "was concerned that his sister [Shad] was attempting to take advantage of him." Mathisen immediately rescinded estate planning documents created while Shad was conservator that had the effect of "leaving everything to her." Mathisen told Chittock that Mathisen "had very little relationship or experience with [Shad]. That he believed she was only interested in his money. That she had attempted to change his will. And in fact when a previous time he was sick she had changed his will making her the beneficiary and that he [*sic*] when he became well again was able to change it and remove her as the conservator. He stated she was an evil person and would kill him the first opportunity she had. And those were his concerns."

Shad and Tsouris became concerned about these accusations of Shad's self-dealing as well as their fears others were stealing from Mathisen. The sisters sought legal

3

counsel from outside the Lassen County area where Mathisen lived and "just everybody knew everybody." Shad and Tsouris wanted "to get an outside source that could sort all this chaos out."

Shad received a recommendation to retain Sare as legal counsel. In March 2006, Shad and Tsouris signed a contingency fee agreement that provided Sare would be entitled to one-third of any money recovered by the sisters as conservators or beneficiaries of Mathisen. However, Sare never signed the March 2006 agreement.

In April 2006, a revised contingency agreement was signed by Shad, Tsouris, and Sare. The signed agreement called for Sare to provide legal representation "regarding Client(s) rights and duties as Conservator or Beneficiaries of DAN MATHISON [*sic*]. The recovery that will be split between the parties of this Agreement is any and all proceeds from the estate of Dan Mathisen." Under the agreement, Sare was entitled to keep one-third of the "gross amount recovered." The gross amount recovered was defined as "the total amount received" by the clients. The agreement stated Sare was allowed to "delegate to other attorneys some of the Attorney's services to be provided to client" and such delegation would "not affect Attorney's fees to be paid by Client."

### Legal Services Provided by Sare

Sare represented the sisters in three areas relating to Mathisen and his property: (1) conservatorship, (2) probate, and (3) matters relating to Mathisen's ranch. Issues concerning the ranch included grazing and livestock, as well as allegedly missing and misused property. An expert for Carole Marie testified that the ongoing nature of the disputes regarding Mathisen's care and property made the challenges of representation "more difficult, more time-consuming and it involves sometimes having to play almost a prophet or a seer as to what the previous attorney or the previous involvement involved and what direction they were taking."

Mathisen died in February 2007, at which point Sare's focus on conservatorship issues shifted to matters concerning probate of the estate. As Carole Marie's expert

4

noted, "this was an estate that had some complexity to it. And it was outside [Sare's] normal jurisdiction as well for the local rules." Sare succeeded in having Shad appointed as administrator of Mathisen's intestate estate. In October 2006, Sare obtained approval for payment of $4,108 in fees from the probate court for his work in connection with Mathisen's conservatorship.

### *Sare's Incapacity and Delegation of Work to Tamara Mallery*

In May 2007, Sare was diagnosed with multiple myeloma as a result of his exposure to Agent Orange. As he became weaker, he associated attorney Tamara Mallery to assist with the probate of Mathisen's estate. Sare died in July 2008.

At the time of Sare's death, the only unfinished tasks in the probate of Mathisen's estate were (1) the filing of the final petition, and (2) obtaining the final order of distribution. Mallery completed these tasks and distributed equally to Shad and Tsouris a total of $822,941.16. Shad and Tsouris never notified the Law Office of Dale L. Sare that they wished to substitute counsel. Even after Sare's death, his law practice was listed as primary legal counsel for the Mathisen probate.

The only uncompleted task about which Shad testified was her request Sare obtain notes created by Mathisen's investment broker. However, those notes were "useless" after Theobold moved investments to a new account. As to the legal services rendered, Carole Marie's expert opined that "[b]ased upon the work, the eleven months that was [*sic*] expended on the conservatorship and then the ranch issues and then the probate matter, probate matter would be a little bit different because a lot of the probate fees are based upon a percentage of the estate, value of the estate. [¶] But looking at everything in its entirety, gross value, my estimate is between 250 and 275, $250,000 and $275,000 for the level of work that was required, the undoing of work and redoing of work that had been performed by others or that needed to be untangled. Over that period of time that would not be an unreasonable amount in my estimation."

5

### *Carole Marie's Action to Recover Legal Fees*

In June 2009, Carole Marie brought an action on behalf of her late husband against Shad and Tsouris to recover the agreed-upon contingency fee. The matter proceeded to a two-day court trial. At the conclusion of trial, the court issued a statement of decision in which it found the "evidence introduced during the trial . . . established conclusively: [¶] 1) That [Sare's] law practice operated as [a] professional corporation which was not fully wound down until after the award was received in the Mathieson [*sic*] Probate case; [¶] 2) That [Sare], and not [Shad nor Tsouris] arranged for the association of the Mallory & Mallory [*sic*] law firm with the Law Offices of Dale Sare to assist and make local appearances for [Sare] as his health failed and after his death; [¶] 3) That at no time prior to the recovery of proceeds on behalf of [Shad and Tsouris] from the estate of Dan Mathieson [*sic*] was the Law Offices of Dale Sare ever replaced or removed as Attorney of Record for . . . Shad and Tsouris in the Mathieson [*sic*] Probate; and [¶] 4) The terms of the Parties' Contingent Fee Agreement cited above clearly allowed [Sare] the right to delegate the performance of attorney services to other attorneys such as Mallory & Mallory [*sic*] without forfeiting any portion of the fees to be paid by [Shad and Tsouris] under the terms of the April 2006 Contingent Fee Agreement." The court further found "the services for which [Shad and Tsouris] had contracted with [Sare] were fully performed by the Law Offices of Dale Sare, and that [Shad and Tsouris] are, therefore, obligated under that contract to pay the entire contingent fee less any amounts that may have already been paid by [Shad and Tsouris] directly to Mallory & Mallory [*sic*] or any other provider." Thus, Sare's estate was entitled to $274,313.72 under the contract less $4,648.03 previously paid to Sare and $19,968.20 previously paid to associated counsel. The trial court entered judgment in favor of Carole Marie in the amount of $250,023.52 plus prejudgment interest.[3] This appeal follows.

---

[3]    The record does not indicate how the trial court calculated Carole Marie was entitled to $250,023.52 when it appears the $274,313.12 contingency fee minus sums

DISCUSSION

## I

### *Whether an Attorney's Death Prior to Completion of Legal Services Extinguishes the Right to a Contingency Fee*

Shad and Tsouris contend Sare's estate is not entitled to the contingency fee because Sare's death terminated the legal services agreement, which was not revived by the association of Mallery as counsel. We disagree.

### A.

### *Contingency Fee Agreements*

It is well established that "[a]ttorney fee agreements are evaluated at the time of their making (*Houge v. Ford* (1955) 44 Cal.2d 706, 713) and must be fair, reasonable and fully explained to the client. (Rule of Professional Conduct 2–107; cf. *Hawk v. State Bar* (1988) 45 Cal.3d 589, 601.) Such contracts are strictly construed against the attorney. (*Bennett v. Potter* (1919) 180 Cal. 736, 740; *Lane v. Wilkins* (1964) 229 Cal.App.2d 315, 323.) In order to protect clients and to assure fee agreements are fair and understood by clients, the Legislature enacted numerous statutes specifically delineating the required contents of most attorney fee agreements. (Bus. & Prof. Code, §§ 6146–6148.)" (*Alderman v. Hamilton* (1988) 205 Cal.App.3d 1033, 1037 (*Alderman*).)

Business and Professions Code section 6147 sets forth the requirements for contingency fee contracts that do not pertain to medical malpractice actions. (*Alderman*, *supra*, 205 Cal.App.3d at p. 1037.) In pertinent part, Business and Professions Code section 6147 instructs that the contingency fee agreement "shall be in writing and shall include, but is not limited to, all of the following: [¶] (1) A statement of the contingency fee rate that the client and attorney have agreed upon. [¶] (2) A statement as to how disbursements and costs incurred in connection with the prosecution or settlement of the

previously paid yields $249,697.49. In any event, none of the parties notes the discrepancy and appellants do not ask for relief based on any computational error.

7

claim will affect the contingency fee and the client's recovery. [¶] (3) A statement as to what extent, if any, the client could be required to pay any compensation to the attorney for related matters that arise out of their relationship not covered by their contingency fee contract. This may include any amounts collected for the plaintiff by the attorney. [¶] (4) Unless the claim is subject to the provisions of Section 6146, a statement that the fee is not set by law but is negotiable between attorney and client. [¶] (5) If the claim is subject to the provisions of Section 6146, a statement that the rates set forth in that section are the maximum limits for the contingency fee agreement, and that the attorney and client may negotiate a lower rate."

In *Cazares v. Saenz* (1989) 208 Cal.App.3d 279 (*Cazares*), the Court of Appeal observed the general practice that "the fee is contingent not only on the ultimate success of the case but also on the amount recovered; that is, the fee is measured as a percentage of the total recovery." (*Id.* at p. 288.) The attorney becomes entitled to the agreed-upon percentage of the money or property subject to the contract "only when the contingency stated in the original agreement has occurred -— i.e., the client has had a recovery by settlement or judgment." (*Fracasse v. Brent* (1972) 6 Cal.3d 784, 792.)

An attorney working under a contingency fee arrangement who fails to secure a favorable result cannot recover payment for legal services from the client. (*Fracasse v. Brent*, *supra*, 6 Cal.3d at p. 792.) As a corollary, an attorney who cannot fulfill the terms of the agreement also cannot receive the contingency fee. "Where a contract contemplates the personal services of a party, performance is excused when that party dies or becomes otherwise incapable of performing." (*Cazares v. Saenz*, *supra*, 208 Cal.App.3d at p. 285.) Shad and Tsouris seek to avail themselves of this rule by arguing Sare's death prior to the completion of legal services prevented his estate from recovering the contingency fee. In so arguing, Shad and Tsouris rely on *Estate of Linnick* (1985) 171 Cal.App.3d 752 (*Linnick*).

*Linnick* affirms the general rule that "when an attorney dies having only partially performed services under a contingent fee contract, his [or her] estate is not entitled to recover any fees for the decedent's services *unless and until* the contract is completed, i.e., the contingency occurs." (*Linnick, supra,* 171 Cal.App.3d at p. 761.) Nonetheless, *Linnick* does not compel the conclusion Sare's estate was not entitled to the contingency fee from Shad and Tsouris.

*Linnick* involved an attorney who entered into a contingency fee agreement with an insurance company to represent the company's interest in the sale of real property. (*Linnick*, *supra*, 171 Cal.App.3d at p. 756.) Under the agreement, the attorney was entitled to receive a percentage of the sale price. (*Ibid.*) Before the sale occurred, the attorney died. Work on the sale was completed by another law firm, which was unaware of the prior contingent fee arrangement. (*Id.* at p. 756-757.) Pursuant to former section 615, decedent attorney's estate sued to recover the contingency fee for the sale, and the trial court found the estate was entitled to the contingency fee. (*Id.* at p. 757-758.) The *Linnick* court reversed on grounds decedent attorney's estate had improperly sued under former section 615, which was "in the nature of a bill of discovery." (*Id.* at p. 759.) Instead, the estate's claim was an attempt to invoke the trial court's jurisdiction under former section 851.5, which provided: "If a person . . . *dies having a claim to real or personal property*, title to or possession of which is held by another, the executor . . . may file with the clerk of the court a verified petition setting forth the facts upon which the claim is predicated." (*Id.* at p. 761.) Under former section 851.5, the estate was not entitled to recover because decedent attorney "did not have a sufficient claim to the contested attorney's fees to entitle his estate to bring the current action." (*Ibid.*)

More importantly for purposes of this case, the *Linnick* court noted that "the decisions are well nigh unanimous in holding that recovery may be had in contingent fee cases if the client ultimately recovers on its claim and the attorney rendered service in respect thereto, but dies before the client recovered. The theory seems to be that death

9

terminates the contract of employment but the attorney having rendered services of value to his client, his estate may recover the fair value of the services rendered pursuant to the contract." (*Linnick, supra,* 171 Cal.App.3d at p. 761, quoting *Roe v. Sears, Roebuck, & Co.* (7th Cir. 1943) 132 F.2d 829, 832, italics omitted.)

As in *Linnick*, the attorney who entered into the contingency fee agreement died before the contingency occurred. (*Linnick*, *supra*, 171 Cal.App.3d at pp. 756-757.) In contrast to *Linnick*, however, decedent attorney in this case made arrangements for the eventual successful completion of the legal services contract. Sare associated Mallery, who succeeded in securing $822,941.16 for Shad and Tsouris. The contingency fee agreement between Sare and the sisters was never repudiated or superseded. Instead, the contract for legal services was fulfilled according to its own terms. Sare's death prior to the fulfillment of the contingency fee agreement did not divest his estate of his entitlement to the agreed-upon fee.

## B.

### *Delegation of Work to Associated Counsel*

Shad and Tsouris argue that "the association of counsel signed by Sare did not revive the written fee agreement following his death." We reject the contention.

The legal services contract expressly allowed Sare to associate counsel. To this end, the first paragraph of the contract provided that "[a]ttorney may delegate to other attorneys some of the Attorney's services to be provided to client. Any such delegation will not affect Attorney's fees to be paid by Client under this Agreement." Consistent with the terms of the contract, Sare associated Mallery after his health began to decline but before he passed away.

Shad testified she was aware Mallery had been associated by Sare to complete the probate of Mathisen's estate. The record contains no indication Shad or Tsouris objected to Mallery's association or performance.

10

In arguing the association of counsel "did not revive" the contingency fee agreement, Shad and Tsouris erroneously assume the agreement lapsed or became ineffective prior to the association. However, Sare associated Mallery while he was still alive and while his contract for legal services was indisputably valid. And, as the trial court found, "at no time prior to the recovery of proceeds on behalf of [Shad and Tsouris] from the estate of Dan Mathieson [*sic*] was the Law Offices of Dale Sare ever replaced or removed as Attorney of Record for . . . Shad and Tsouris in the Mathieson [*sic*] Probate." Consequently, Sare acted consistently with a valid legal services agreement when he associated Mallery.

Shad and Tsouris attack the selection of Mallery as associate counsel on grounds it allowed Sare to exercise impermissibly broad power to delegate legal work in the case. The sisters point out that the contract contemplated the legal services would be "performed principally by Dale L. Sare, Esq." Shad and Tsouris characterize Sare's delegation of work as running afoul of the rule that "[a]n attorney is not authorized . . . merely by virtue of his [or her] retention in litigation, to 'impair the client's substantial rights or the cause of action itself.' " (*Blanton v. Womancare, Inc*. (1985) 38 Cal.3d 396, 404, quoting in part *Linsk v. Linsk* (1969) 70 Cal.2d 272, 276.)

The argument fails for two reasons. First, the evidence introduced by Carole Marie's expert established that Sare himself performed as the principal attorney on behalf of Shad and Tsouris by handling an extensive set of issues arising out of the conservatorship, probate, and ranch. Second, Sare's delegation of work in completing the probate was entirely consistent with the terms of the contingency fee agreement. Shad was aware of the association of counsel but neither sister objected to the delegation of work to Mallery. The sisters had an absolute right to remove Sare or object to Mallery's representation. (*Fracasse, supra,* 6 Cal.3d at p. 790.) However, as the trial court found, neither Shad nor Tsouris acted to remove or substitute counsel at any time. Accordingly, the delegation was not improper.

11

## C.

***New Factual Contentions Regarding Sare's Corporate Entity and the Winding Down of his Law Practice***

Shad and Tsouris assert the Law Offices of Dale L. Sare –- the corporate entity for decedent's law practice –- was not a party to the contingency fee agreement. They argue that "to the extent that the winding down of Dale Sare's professional corporation might have had some legal effect on the enforceability of the corporation's pending fee agreements following the death of Dale Sare, it would not similarly effect [*sic*] the fee agreement which is the subject of this appeal, because the agreement in this case was between [Shad and Tsouris] and Dale L. Sare, individually." We deem these contentions to be noncognizable on appeal for failure to properly raise them first in the trial court.

As this court has previously recognized, an argument raised for the first time on appeal is generally deemed forfeited. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc*. (2006) 136 Cal.App.4th 212, 226.) Moreover, "[t]he general rule that a legal theory may not be raised for the first time on appeal is to be stringently applied when the new theory depends on controverted factual questions whose relevance thereto was not made to appear at trial." (*Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780.)

At trial, Shad and Tsouris defended on two theories: (1) the fee agreement was voidable, at their option, because they did not receive a signed copy from Sare as required by Business and Professions Code section 6147, and (2) Sare's death prior to completion of the legal services terminated the agreement as a matter of law. The sisters also disputed Carole Marie's expert testimony regarding the reasonable value of Sare's services. However, they did not raise issues of whether it was Sare personally or his corporate entity that entered into the legal services agreement, and they did not seek to show his law practice was improperly wound down. Had Shad and Tsouris done so, Carole Marie would have had the opportunity to adduce evidence in response to such

12

factual contentions. For failure to raise these issues of fact at trial, we deem the arguments to have not been preserved for appeal.

## II

### *Legal Services Performed under the Contingency Fee Agreement*

Shad and Tsouris next contend the trial court erred in finding all of the legal services required under the contingency fee contract were completed. Specifically, the sisters point out they "sought to recover: (i) antiques that were taken from their brother's ranch by Carl Pfeiffer; (ii) 'barnwood' taken from an historic structure on the ranch; (iii) accoutrements taken from the 1850's era Victorian home which were removed by 'Randy,' a construction worker hired by Mary Rower; (iv) an assortment of ancient Indian relics which had been identified as such by Indian affairs activists (a large portion of the ranch covered an Indian burial ground); and (v) large sums of money drawn from various financial and investment accounts by Mary Rower and possibly others." We are not persuaded.

### A.

### *Scope of Legal Services under the Contract for Legal Services*

The contingency fee contract delineated contemplated legal services as those "regarding [Shad and Tsouris's] rights and duties as Conservator or Beneficiaries of DAN MATHISEN." Thus, the recovery subject to the contingency fee was defined as "all proceeds from the *estate* of Dan Mathisen." (Italics added.) In June 2007, Sare wrote an internal memo indicating they needed "to commence preparing a case against certain individuals on the Mathisen file, namely Mary Rohrer (spelling??) [Rower]." Thus, Sare indicated the need to investigate financial records pertaining to Mathisen's investment accounts.

In July 2007, the sisters wrote to Sare to express their ire regarding the perceived theft of items from Mathisen's ranch. In a letter dated July 7, 2006, from the sisters titled, "Follow up to the Civil Matters of Mathisen," the sisters indicated they "wish[ed]

13

to begin with filing a complaint with the State Bar of California" based on Nareau's "negligence and ineptitude in his duties as our court representative." As an example of Nareau's alleged legal malpractice, the sisters recounted the loss of the antiques, barnwood, home accoutrements, and Indian relics from Mathisen's ranch. In the same connection, they also recounted the alleged thefts and meddling by Rower.

The sisters' letter concludes with three "questions" posed to Sare, namely (1) who would file the complaint with the State Bar regarding Nareau, (2) how would they address the "inept services" of Nareau's paralegal, and (3) expressing their "wish to sue Taylor and Rower and others who profited from taking our brother [*sic*] property by dismantling his homestead and his existence."

At trial, Tsouris testified about the letter: "Maybe I didn't know exactly what the document was called and this was for [Sare]'s enlightenment. This wasn't for anybody else's eyes. It was just to give him some background information as to where we were coming from when we decided to hire him."

The sisters followed up with another letter to Sare in August 2007, in which they noted the Mathisen ranch might have valuable rights of way for railroad lines. Thus, the sisters exclaimed, "the whole issue of rights of way for rail lines on real property is worth pursuing!!"

## B.

### *Services Performed*

The trial court found "the services for which [Shad and Tsouris] had contracted with [Sare] were fully performed by the Law Offices of Dale Sare, and that [Shad and Tsouris] are, therefore, obligated under that contract to pay the entire contingent fee less any amounts that may already have been paid by" Shad and Tsouris. The record establishes that Shad and Tsouris shared $822,941.16 received from Mathisen's estate.

The sisters' contention rests on the assumption Sare was not entitled to any contingency fee until all possible claims relating to Mathisen's estate were exhausted.

14

On this point, we note the contract for legal services only specified services on behalf of Shad and Tsouris as conservators and beneficiaries of Mathisen. At the time Sare agreed to represent Shad and Tsouris, the sisters were neither conservators nor beneficiaries of Mathisen's estate. Sare's efforts focused on the sisters becoming or remaining beneficiaries of the estate.

Clearly, some of the claims did not relate to the sisters' capacities to receive money or property as conservatees or beneficiaries. For example, a State Bar complaint urging discipline of Nareau would result neither in monetary recovery nor relate to the winding down of Mathisen's estate. Similarly, exploration of the sale of property rights to a railroad did not fall within the confines of conservatorship or probate.

While claims against individuals alleged to have stolen from Mathisen arguably could fall within the scope of representation for Mathisen's conservators or beneficiaries, Shad and Tsouris are not claiming malpractice by Sare. To the contrary, because of Sare's efforts, Mathisen's estate was probated intestate. As a result, the sisters became beneficiaries of Mathisen's estate and each received one-half of the estate. Instead, the sisters contend they are entitled to take the benefit of Sare's work without having to pay the agreed-upon contingency fee. We disagree.

Having received the benefit of the bargain, Shad and Tsouris are also subject to its cost. (Civ. Code, § 3521 ["He who takes the benefit must bear the burden"].) We also reject the assumption Sare's estate had to wait for its percentage of money recovered while additional, uncertain claims against other individuals might have been pursued. (Cf. *Sayble v. Feinman* (1978) 76 Cal.App.3d 509, 515 [contingency fee payments were due and payable to legal counsel when money was realized, first, from a lump sum settlement and then from the monthly annuity as paid].) Sare's estate was entitled to the agreed-upon contingency fee when Sare and Tsouris received their distribution from Mathisen's estate.

15

*Lack of Prior Approval of the Contingency Fee by the Probate Court*

Finally, Shad and Tsouris contend the contingency fee agreement was not recoverable because it had not been previously approved by the court under sections 2644[4] and 10811, subdivision (c)[5]. We are not persuaded.

"In proceedings for the probate of a decedent's estate in California, the compensation of the personal representative and the compensation of the personal representative's attorney are each fixed through the use of two quite different approaches. To begin with, in every case the personal representative and his or her attorney are entitled to compensation based upon a sliding scale of percentages of the value of the estate accounted for. (§§ 10800, 10810.) Because this compensation is intended as payment for the services which are involved in substantially every probate case, it is commonly known as 'statutory' or 'ordinary' compensation or as compensation for 'statutory' or 'ordinary' services. The second approach provides for compensation for services which are not involved in the typical probate case, and that approach authorizes

---

[4] Subdivision (a) of section 2644 provides: "Where it is *to the advantage, benefit, and best interest of the ward or conservatee or the estate*, the guardian or conservator of the estate may contract with an attorney for a contingent fee for the attorney's services in representing the ward or conservatee or the estate in connection with a matter that is of a type that is customarily the subject of a contingent fee contract, but such a contract is valid only if (1) the contract is made pursuant to an order of the court authorizing the guardian or conservator to execute the contract or (2) the contract is approved by order of the court." (Italics added.)

[5] Subdivision (c) of section 10811 provides: "An attorney for the personal representative may agree to perform extraordinary service on a contingent fee basis subject to the following conditions: [¶] (1) The agreement is written and complies with all the requirements of Section 6147 of the Business and Professions Code. [¶] (2) The agreement is approved by the court following a hearing noticed as provided in Section 10812. [¶] (3) The court determines that the compensation provided in the agreement is just and reasonable and the agreement is *to the advantage of the estate* and in the best interests of the persons who are interested in the estate." (Italics added.)

the court to allow additional compensation for those unusual services -— so-called 'extraordinary' services. . . . Sections 10801 (as to personal representatives) and 10811 (as to their attorneys) provide that the probate court 'may allow additional compensation for extraordinary services . . . in an amount the court determines is just and reasonable.' Compensation determined by this second approach is commonly known as 'extraordinary' compensation or as compensation for 'extraordinary services.' " (*Estate of Hilton* (1996) 44 Cal.App.4th 890, 894-895, fns. omitted.) " 'Extraordinary' services may include services in connection with such matters as litigation with third parties, federal estate tax matters, sales of property, etc." (*Id.* at p. 895, fn. 5.)

Here, Sare's representation of the sisters was focused on ensuring they would receive a share of Mathisen's estate. Both sisters were at risk of receiving nothing from the estate. In her testimony, Tsouris acknowledged Sare's efforts on her behalf were centered on ensuring she would be included as a beneficiary of Mathisen's estate:

"Q. Would you agree that throughout the course of all this litigation, all of this, the legal matters going on with [Mathisen], that your role to whatever extent that may be was as [his] half-sister and as ultimately a beneficiary to his probated estate?

"A. Yes."

Shad testified that in August 2004, she became aware Mathisen intended to create a trust that did not list Tsouris as a beneficiary at all. Indeed, it appears Tsouris was not a beneficiary of Mathisen in any trust or will prior to his death.

Similarly, Shad was also in jeopardy of inheriting nothing at times prior to Mathisen's death. Around February 2006, Mathisen regained some strength and acted to preclude any inheritance by Shad. Mathisen indicated he "wanted all of his estate and proceeds to go to the local animal shelter." Indeed, Mathisen told Chittock "he didn't trust any of them [referring to Shad and Tsouris] and they were only out to get his money."

17

Sare's legal services were performed on behalf of sisters who stood a substantial chance of inheriting nothing. Consequently, Sare's efforts with respect to Shad and Tsouris were not for the benefit of the estate but solely to ensure Shad and Tsouris would receive something from their half brother's estate (despite Mathisen's intent that the sisters not receive anything from his estate). Sections 2644 and 10811 govern contingency fee agreements related to legal services that are "to the advantage of the estate" (§ 10811) or "to the advantage, benefit, and best interest of . . . the estate" (§ 2644). Here, the fee agreement was not made for the advantage of Mathisen's estate, but for the personal benefit of Shad and Tsouris that they might become or remain beneficiaries of the estate. Accordingly, the contingency fee agreement with Sare is not invalid for noncompliance with section 2644 or 10811.

DISPOSITION

The judgment is affirmed. Respondent Carole Marie Sare shall recover costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


       HOCH       , J.


We concur:


      BUTZ     , Acting P. J.


     MAURO    , J.


18